IN THE SUPREME COURT OF TENNESSEE
AT JACKSON

# LARRY W. BARNES v. THE GOODYEAR TIRE AND RUBBER COMPANY

**Appeal from the Chancery Court for Obion County**
**No. 16,153      W. Michael Maloan, Chancellor**

---

**No. W1997-00247-SC-R11-CV - Decided May 30, 2000**
**FOR PUBLICATION**

---

We granted this appeal to address:  (1)  the appropriate framework for analyzing a handicap discrimination claim under the Tennessee Handicap Discrimination Act; and (2)  whether the evidence supported the jury's finding of handicap discrimination.  We hold that the record contains material evidence to support the jury's verdict.  The Court of Appeals is reversed and the case is remanded to the Court of Appeals for resolution of the issues pretermitted by that court.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Case Remanded**

HOLDER, J., delivered the opinion of the court, in which ANDERSON, C.J., and DROWOTA, BIRCH, and BARKER, JJ., joined.

Dan M. Norwood, Memphis, Tennessee, for the appellant, Larry W. Barnes

Tim K. Garrett and Michael S. Moschel, Nashville, Tennessee and James M. Glascow, Jr., Union City, Tennessee, for the appellee, The Goodyear Tire and Rubber Company

**OPINION**

**FACTS**

The plaintiff, Larry W. Barnes, was employed by the defendant, Goodyear Tire & Rubber Company ("Goodyear").  Barnes began working for the defendant in 1970.  He had worked in several different positions during his employ with the defendant.  In 1987, Barnes was commended for his outstanding performance as a Process Control Operator.

Barnes was diagnosed as having Bell's Palsy during the summer of 1989.  Bell's Palsy is a condition of the nervous system that affects facial muscles.  He presented symptoms of slurred speech, paralysis of the facial muscles, and paralysis of his right eye.  Barnes was unable to work for approximately six weeks.  The manifestations of Bell's Palsy were present when he returned to

work. He testified that his "mouth was still drooped down" and that his "right eye was still open." He experienced difficulty in speaking. He stated, "I would talk for a minute and I'd get slurred." His eye "watered profusely" and he "had to have co-workers put Lacrilube cream and drops in" his eye every two hours.

Barnes testified that he was ridiculed when he returned to work. Co-workers made gestures concerning his appearance. Others "made hideous remarks" which resulted in an exchange of words. Barnes, however, denied having communication problems other than those resulting from the instances of personal ridicule.

In October of 1989, Barnes' shift was changed as the result of a reorganization. Barnes testified that he had worked the second shift fifty to sixty percent of the time during periods of shift rotation and that he "enjoyed the second shift." Working on the second shift enabled him to "get up in the mornings and go hunting."

In August of 1990, Goodyear began implementing a reduction in work-force ("RIF") plan. Goodyear had conducted a study indicating that Goodyear was top-heavy with salaried employees in comparison to its competitors. Goodyear, therefore, decided to reduce its salaried workforce by twenty percent over the course of three years. Goodyear's 1990 personnel reduction policy provided two methods for selecting employees for layoff. Layoffs could either be made on the basis of seniority or on the basis of job performance.

The plant at which Barnes was employed utilized both methods of reduction. While certain departments used the seniority method, a job performance method was utilized in the plaintiff's department. The seven employees with the lowest performance evaluations were to be laid off.

David Nelms, Barnes' supervisor, evaluated Barnes. The evaluation was performed after Barnes had been diagnosed with Bell's Palsy and had returned to work. Barnes' evaluation was fifth lowest. Barnes received a poor evaluation due to communication problems. At trial, Nelms explained that Barnes received a lower evaluation due to Barnes' failure to communicate with the first shift operator. Nelms testified that Barnes refused to communicate with the first shift operator because Barnes was upset about being switched to second shift. Barnes disputed this contention. He proffered his testimony and the testimony of several co-workers indicating that there was not a communication problem between him and the first shift supervisor. Nelms testified that he spoke to Barnes about his failure to communicate with the first shift. Barnes denied that any such conversation between Nelms and Barnes took place. Barnes maintained that the only communication problems that may have arisen at work involved situations where he was ridiculed because of his Bell's Palsy.

In September of 1990, Barnes was called into Nelms' office and informed that he was being laid off. At trial, Barnes testified:

> I said, "Why am I being laid off? Is it because of my job
> performance, my attitude, my attendance? He said, "Naw." I said,

"Is it because I had Bell's Palsy and I missed time and nobody else didn't?" He said, "That's right." He got up and left.

Nelms testified that he could not recall this conversation with Barnes. Nelms, did not, however, deny that it occurred.

Goodyear designated Barnes' layoff as "recallable." The record reflects that Barnes was eligible for recall for up to a four-year period. He, however, apparently lost the right to be recalled to a salaried position if he accepted an hourly position with Goodyear. Goodyear offered Barnes a temporary hourly position with Hamilton-Ryker that paid $8.25 per hour or approximately one-half of his previous salary. Barnes rejected this offer.

In September of 1991, Barnes filed suit against Goodyear pursuant to Tenn. Code Ann. § 8-50-103, the Tennessee Handicap Act ("THA"). Barnes alleged that Goodyear terminated his employment in violation of the THA because he was handicapped or perceived by Goodyear to be handicapped. In July of 1993, Goodyear offered Barnes an hourly position that paid over $16.00 per hour. Barnes accepted this hourly position and lost his right to be recalled to a salaried position.

Barnes' action for handicap discrimination went to trial in May of 1996. Goodyear moved for a directed verdict at the conclusion of Barnes' proof. The trial judge held that the evidence did not demonstrate that Barnes was handicapped. Accordingly, the trial judge granted a directed verdict as to that claim. The trial court, however, denied Goodyear's motion for a directed verdict on the issue of whether Barnes sustained an adverse employment action on the basis of a perceived handicap in violation of the THA.

The jury found that Goodyear perceived Barnes as being handicapped and that Barnes sustained an adverse employment action as a result of this perception. The jury awarded damages of $150,000 for back pay and $150,000 for humiliation and embarrassment. The trial court upheld the jury's finding of liability but suggested a remittitur of Barnes' damages to $100,000 for back pay and $75,000 for humiliation and embarrassment. The trial court also awarded Barnes $28,690 for attorney's fees and $1,073.37 for court costs. Barnes accepted the remittitur under protest and appealed. Barnes also appealed the calculation of the attorneys' fees awarded by the trial court. Goodyear appealed the trial court's denial of Goodyear's motion for a directed verdict. In the alternative, Goodyear appealed the amount of the remittitur, contending that the verdict should be further reduced due to Barnes' failure to mitigate his damages.

The Court of Appeals reversed the jury's finding of liability. The court reasoned that the record was devoid of evidence suggesting "that Goodyear regarded Barnes as suffering from an impairment that substantially limited any of his major life activities." The court also found that Goodyear did not regard Barnes as substantially limited in his ability to work or perform manual tasks because Goodyear offered Barnes the temporary hourly rate position with Hamilton-Ryker. The remaining issues were pretermitted. We granted review.

## ANALYSIS

The standard of appellate review when reviewing a jury verdict approved by a trial court is whether there is any material evidence to support the verdict. Tenn. R. App. P., Rule 13(d). When addressing whether there is material evidence to support a verdict, an appellate court shall: (1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence. Crabtree Masonry Co. v. C & R Constr., Inc., 575 S.W.2d 4, 5 (Tenn.1978); Black v. Quinn, 646 S.W.2d 437, 439-40 (Tenn. App. 1982). Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies. If the record contains "any material evidence to support the verdict, [the jury's findings] must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury." Crabtree Masonry Co., 575 S.W.2d at 5.

The issue now before us is whether the plaintiff proffered any material evidence during trial which would support the jury's finding of handicap discrimination. The THA prohibits discrimination in the workplace and is codified at Tenn. Code Ann. § 8-50-103. Specifically, the THA prohibits:

> discrimination in the hiring, firing and other terms and conditions of employment . . . of any private employer, against any applicant for employment based solely upon any physical, mental or visual handicap of the applicant, unless such handicap to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.

Tenn. Code Ann. § 8-50-103(a). Accordingly, an individual alleging discrimination under the THA must show: (1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability.

As a preliminary matter, we note that we are neither bound by nor restricted by the federal law when interpreting our own anti-discrimination laws. The THA embodies the definitions and remedies provided by the Tennessee Human Rights Act ("THRA"). Forbes v. Wilson County Emergency, 966 S.W.2d 417, 420 (Tenn. 1998). The legislature's stated purpose in codifying the THRA was to prohibit discrimination in a manner consistent with "the federal Civil Rights Acts of 1964, 1968, and 1972, . . . ." Tenn. Code Ann. § 4-21-101(a)(1), -101(a)(2). We, therefore, may look to federal law for guidance in enforcing our own anti-discrimination laws.

### I.

Our initial inquiry is whether Barnes was qualified for the position he formerly occupied. An individual may be deemed qualified if the individual can perform, with or without reasonable accommodation, the essential functions of the employment position in question. See generally 42

-4-

U.S.C. § 12111(8); <u>Southeastern Comm. College v. Davis</u>, 442 U.S. 397, 406 (1979). We believe that an analysis of the qualifications of an individual alleging discrimination under the THA should focus on the time frame during which the employment decision was made.

A record of absenteeism may be relevant when addressing an ongoing qualification to perform a specific job. <u>See</u> generally <u>Gantt v. Wilson Sporting Goods Co.</u>, 143 F.3d 1042, 1047 (6th Cir. 1998) (holding that plaintiff was not qualified for position due to lengthy absence); <u>Waggoner v. Olin Corp.</u>, 169 F.3d 481, 482-84 (7th Cir. 1999) (holding that plaintiff was not a qualified individual due to unexplained "excessive erratic absences"). An employee "who does not come to work cannot perform any of his job functions, essential or otherwise." <u>Tyndall v. National Educ. Ctrs., Inc.</u>, 31 F.3d 209, 213 (4th Cir. 1994) (quoting <u>Wimbley v. Bolger</u>, 642 F.Supp. 481, 485 (W.D. Tenn. 1986), <u>aff'd</u>, 831 F.2d 298 (6th Cir. 1987)); <u>Greer v. Emerson Elec. Co.</u>, 185 F.3d 917, 921 (8th Cir. 1999). In determining whether an individual is a "qualified individual," courts may look to whether the level of unscheduled absenteeism was detrimental to the employer's operation. <u>Morgan v. Hilti, Inc.</u>, 108 F.3d 1319, 1324 (10th Cir. 1997).

The defendant does not argue that the employee's absenteeism interfered with company operations or job performance. To the contrary, the defendant concedes that the plaintiff was qualified for the position and could perform his duties. Accordingly, the record supports a finding that the plaintiff was qualified for the position from which he was laid off.

The Court of Appeals held that "[taking] adverse employment action against an employee for past absenteeism as a result of an impairment is not a violation of the THA." The analysis employed by the appellate court would have been appropriate in this case to determine whether the plaintiff were a "qualified individual." However, the issue of whether any disability-related conduct that is neither illegal nor egregious can form a permissible basis for an adverse employment action under our anti-discrimination laws has yet to be decided. A causal nexus with the disability-related conduct combined with direct evidence of improper motivation may be sufficient under the THA to sustain a claim for handicap discrimination. Such is the case now before us.

**II.**

The second element requires that the claimant be disabled. The term "handicap" is not defined by the THA. We have previously recognized that the THA embodies the rights and definitions of the THRA. <u>Forbes v. Wilson County Emergency</u>, 966 S.W.2d 417, 420 (Tenn. 1998). The THRA defines "handicap" as:

       (i)     A physical or mental impairment which substantially limits one (1) or more of such person's major life activities;

       (ii)    A record of having such an impairment; or

       (iii)   Being regarded as having such an impairment;

Tenn. Code Ann. § 4-21-102(9)(A). The THRA's definition of handicap includes individuals perceived or "regarded" as having an impairment "which substantially limits a major life activity." Forbes, 966 S.W.2d at 420.

The relevant inquiry in this case is whether the evidence supported a finding that the defendant regarded the plaintiff as being impaired. The plaintiff has presented evidence that he suffered from an impairment. The plaintiff further submitted evidence that the defendant premised its adverse employment decision on the fact that the plaintiff suffered an impairment.

While the impairment may not have substantially limited a major life activity, the plaintiff may be regarded as disabled if the defendant treated him as if his impairment substantially limited a major life activity. Sutton v. United Airlines, 527 U.S. 471, 119 S.Ct. 2139, 2149-150 (1999). Major life activities include communicating by speech and the ability to report for work. An impairment that may disqualify one from working at a job of choice does not limit a major life activity. See id. at 2150. However, an impairment that results in the inability to appear for work limits a major life activity by disqualifying one from a broad class of jobs.

The record contains evidence that the defendant premised its employment decision upon the plaintiff's absences and communication problems. The defendant argues that the communication problems were not impairment-related but were the result of personality conflicts. The plaintiff denied any personality conflicts and proffered evidence that any communication problems were a consequence of his Bell's Palsy. Whether the communication problems arose from a personality conflict or were a consequence of the Bell's Palsy was a disputed issue of fact.

While the THA may permit an employer to consider the ability to communicate in assessing whether an individual is qualified for a position, the THA prohibits an employer from terminating an employee for a perceived disability or handicap. See generally Sutton, 527 U.S. at ____, 119 S.Ct. at 2149. The record supports a finding that the basis for the layoff was an impairment. The plaintiff proffered evidence of a statement that indicated that he was laid off "because [he] had Bell's Palsy and [he] missed [work]." This statement supports an inference that the defendant believed that the plaintiff's impairment interfered with his ability to appear for work.

The standard of review in this case does not permit this Court to determine where the preponderance of the evidence lies or to assess witness credibility. These assessments were the sole province of the jury. The jury apparently resolved the evidentiary conflicts in favor of the plaintiff and found that the defendant perceived the plaintiff's impairment as substantially limiting his ability to talk and appear for work. Discarding all countervailing evidence, as we must, we cannot conclude that the record lacks any material evidence to support the jury's finding that the plaintiff was handicapped as defined by the THRA.

### III.

An affirmative answer to the first two criteria leads us to the next inquiry under the THA. We must now address whether the plaintiff suffered an adverse employment action. An adverse

employment action, as contemplated by the THA, is a material and adverse change in the terms and conditions of employment. See generally Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996). The change must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Crady v. Liberty Nat'l Bank & Trust Co. of Ind., 993 F.2d 132, 136 (7th Cir. 1993). The following is a non-exhaustive list of adverse employment actions: termination of employment; demotion evidenced by a decrease in wage or salary, by a less distinguished title, or by a material loss of employment benefits; or a significant reduction of material responsibilities. Crady, 993 F.2d at 132; see also DiMeglio v. Haines, 45 F.3d 790, 804 (4th Cir. 1995) (indicating a reprimand and reassignment may constitute an adverse employment action); Dahm v. Flynn, 60 F.3d 253, 257 (7th Cir.1994) (stating dramatic downward shift in skill level required can constitute an adverse employment action); Goodwin v. Circuit Court of St. Louis County, Mo., 729 F.2d 541, 547 (8th Cir.1984) (holding transfer, with the same pay, from hearing officer to staff attorney was adverse because less prestigious); Frazier v. Heritage Fed. Bank for Savings, 955 S.W.2d 633, 636 (Tenn. Ct. App. 1997) (noting reduction in duties and prestige were "materially adverse changes" in terms and conditions of employment).

The plaintiff was laid off. A layoff is clearly an adverse employment action. Even assuming that the plaintiff accepted the Hamilton-Ryker offer, the plaintiff still would have sustained an adverse employment action. The Hamilton-Ryker position was a temporary, hourly position which would have paid the plaintiff approximately one-half of his previous salary. The Hamilton-Ryker position apparently did not include employee benefits, and acceptance of the position may have terminated the plaintiff's right to be recalled as a salaried worker. Goodyear's decision to lay off the plaintiff and to offer him the Hamilton-Ryker position constituted an adverse employment action.

The third element of the analysis further requires a claimant to establish that a prohibited motivation made a difference in the adverse employment decision. There are two evidentiary methods for establishing this "but for" causation. A claimant may either use the direct method or the indirect method. Matthews v. Commonwealth Edison Co., 941 F.Supp. 721, 724 (N.D. Ill. 1996). Under the direct method, the claimant simply relies on direct evidence of intentional discrimination. See Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989) ("Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption."). Once direct evidence of intentional discrimination is shown, the burden shifts to the employer. The employer must then proffer a non-discriminatory reason which, when standing alone, would have induced the employer's action. Wall v. Trust Co. of Ga., 946 F.2d 805, 809 (11th Cir. 1991); see also Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1184 (6th Cir. 1996) (stating "no need" for further burden shift when direct evidence is available.).

The indirect method employs the burden-shifting analysis developed in Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248 (1981). The initial inquiry under the indirect burden-shifting analysis is whether the claimant can establish a prima facie case of disability discrimination. Wolf v. Buss America, 77 F.3d 914, 919 (7th Cir. 1996). A prima facie case of disability discrimination requires a showing that: (1) the claimant is a member of a protected class; (2) the claimant's work performance met the employer's legitimate expectations; (3) the claimant sustained an adverse employment action; and (4) employees not in the protected class were treated more

favorably. Matthews, 941 F.Supp at 724, 725; Wolf, 77 F.3d at 919. The elements of a prima facie case may vary depending upon the method of discrimination and the unique circumstances of each case. Hutson v. McDonnell Douglas Corp., 63 F.3d 771, 775 (8th Cir. 1995). The establishment of a prima facie case shall create a rebuttable presumption of disability discrimination. Wolf, 77 F.3d at 919.

The next stage of the indirect method imposes a burden of production on the employer. If the claimant successfully establishes the prima facie case, the employer must articulate a legitimate non-discriminatory reason for the adverse employment action. Kiel v. Select Artificials, Inc.,169 F.3d 1131, 1135 (8th Cir.1999). The articulation of a non-discriminatory reason rebuts the presumption of discrimination and shifts the burden back to the claimant. Id. The last stage of the inquiry requires the claimant to show that the employer's proffered reasons for the employment decision were pretext for unlawful discrimination. Id. To establish pretext, the claimant can either show: (1) that the employer was more likely than not motivated by a discriminatory reason; or (2) that the employer's explanation was not credible. Wolf, 77 F.3d at 919.

The case now before us involves a RIF. Accordingly, the plaintiff was required to prove: (1) that he was disabled as defined by the THRA; (2) that he could perform his job of "Process Control Operator"; and (3) that Goodyear selected him for layoff because of his disability.

The evidence adduced at trial supported a finding of "but for" cause under the direct method. See Maldonado v. U.S. Bank, 186 F.3d 759, 763 (7th Cir. 1999) (stating if plaintiff emphasizes one method, "but the proper result is clear under the other method, we need not rely on procedural niceties and ignore the obvious"). Barnes testified that when he asked whether he were being laid off due to his Bell's Palsy and the impairment-related absences, Nelms responded affirmatively. This affirmation was contemporaneous with the adverse employment action, concerned the employment action at issue, and was uttered by Nelms, Barnes' supervisor. Nelms has not directly refuted this testimony. Accordingly, Barnes has presented evidence of intentional discrimination sufficient to satisfy "but for" cause or element (3).

Goodyear's burden under the direct method has been triggered. To avoid a finding of liability, Goodyear must proffer evidence of a legitimate justification for the employment decision. Goodyear could attempt to meet this burden by showing that the employment action was premised on a bona fide occupational qualification. See generally, International Union v. Johnson Controls, 499 U.S. 187, 200-01 (1989). Under the direct method approach, however, Goodyear must still establish that the same decision would have been made absent any improper motivation. A mere showing that the decision would have been justified is insufficient. See generally Price Waterhouse v. Hopkins, 400 U.S. 228, 252 (1989). Accordingly, Goodyear must show that the proffered legitimate reason, standing alone, would have induced its decision to lay off Barnes.

Barnes was laid off during a RIF. While a RIF is generally a legitimate, non-discriminatory reason for an employment action, an employer may not utilize a RIF as a convenient opportunity to rid its workforce of disabled workers. Matthews v. Commonwealth Edison Co., 128 F.3d 1194, 1194 (7th Cir. 1997); Montana v. First Federal Savings & Loan Ass'n, 869 F.2d 100, 106 (2nd Cir

1989); Herold v. Hajoca Corp., 864 F.2d 317, 320 (4th Cir. 1988); Hardin v. Hussmann Corp., 45 F.3d 262, 265-66 (8th Cir. 1995). "A RIF is not an open sesame to discrimination against a disabled person." Matthews, 128 F.3d at 1194. An employer should not be permitted to circumvent the Americans with Disabilities Act through a practice of overhiring and later utilizing a RIF to weed out disabled workers. Id. Accordingly, the mere assertion of a RIF in a direct evidence disability discrimination case does not, as a matter of law, entitle the employer to summary judgment. We hold that it was a question of fact whether Goodyear had established by a preponderance of the evidence that Barnes would have been laid off during the RIF absent any impermissible motivations.

Reweighing the evidence of this case and re-assessing the witnesses' credibility is simply beyond the purview of this Court. Whether this Court would have made the same credibility assessments or findings of fact that the jury did in this case is of no consequence. The assessment of witness credibility and resolution of evidentiary conflicts was within the sole province of the jury. The jury obviously believed that discriminatory animus was a motivating factor in this case. While the case is extremely close, we cannot conclude that there is no material evidence in this record to support the jury's finding.

## CONCLUSION

We hold that the appropriate framework for analyzing a handicap discrimination claim under the THA and the THRA is as follows. First, a claimant must establish that he or she is a qualified individual with a disability. Next, the claimant must show that he or she can perform the essential functions of the job with or without reasonable accommodation. Finally, the claimant must show that he or she was subjected to an adverse employment action on the basis of a protected disability. The claimant can establish causation under either a direct evidence method or an indirect evidence method. A showing of direct evidence of intentional discrimination entitles the claimant to judgment unless the employer shows that an impermissible motive did not play a role in the employment decision. If the claimant is unable to proffer direct evidence of discrimination, the claimant can rely on circumstantial evidence under the indirect evidence method. We adopt the Burdine burden-shifting analysis to analyze indirect evidence cases.

In the case now before us, Barnes presented direct evidence of discrimination. Goodyear attempted to establish that a RIF led to the employment decision and that an impermissible motive did not play a role in the employment decision. Goodyear, therefore, created a material issue of fact as to the element of causation. A jury listened to the evidence, viewed witness demeanor, and found that Barnes' perceived disability was a factor in the decision to lay off Barnes. We cannot supplant the jury's findings and inferences with those of our own. We hold that the record contains material evidence to support a finding of handicap discrimination under Tenn. Code Ann. § 50-8-103 and the THRA.

The decision of the Court of Appeals is reversed. The jury's verdict is reinstated. The case is remanded for consideration of the issues pretermitted by the appellate court. Costs of this appeal shall be taxed against the defendant, Goodyear Tire and Rubber Company, for which execution may issue if necessary.

-9-