# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 10, 2006 Session

## JOAN OATES v. CHATTANOOGA PUBLISHING COMPANY d/b/a CHATTANOOGA TIMES FREE PRESS

**Appeal from the Chancery Court for Hamilton County**
**No. 04-0743    W. Frank Brown, III, Chancellor**

---

**No. E2005-00778-COA-R3-CV - FILED MARCH 21, 2006**

---

Joan Oates ("Plaintiff") was employed by the Chattanooga Publishing Company ("Defendant") for approximately twenty-three years. In January of 2004, Plaintiff was observed on Defendant's security camera making obscene gestures with her middle finger toward the camera and then covering the security camera with a cup for a period of time. Defendant terminated Plaintiff's employment. Plaintiff filed this lawsuit alleging that she was terminated because of a disability. Plaintiff also claimed that she was subjected to a hostile work environment and malicious harassment while employed by Defendant. Plaintiff also sued for intentional and/or negligent infliction of emotional distress. The Trial Court granted Defendant's motion for summary judgment on all of Plaintiff's claims. Plaintiff appeals, and we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the**
**Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and SHARON G. LEE, JJ., joined.

Richard A. Schulman and R. Jonathan Guthrie, Chattanooga, Tennessee, for the Appellant Joan Oates.

L. Michael Zinser and Matthew Salada, Nashville, Tennessee, for the Appellee Chattanooga Publishing Company d/b/a Chattanooga Times Free Press.

## OPINION

## Background

In October of 1966, Plaintiff was involved in a serious automobile accident and remained in a coma for approximately forty-nine days. Plaintiff was nine years old at the time of this accident and required months of hospitalization and rehabilitation once she emerged from the coma. A steel plate eventually was inserted into Plaintiff's head to help protect her from further injury. As a result of this accident, Plaintiff was partially paralyzed on the right side of her body and had impairments to the use of her right arm, hip and leg. Plaintiff also has a speech impediment and difficulty talking. Notwithstanding Plaintiff's injuries, Mr. Frank McDonald hired Plaintiff to work for Defendant in June of 1980. For the first ten years of her employment, Plaintiff composed stock market tables for publication in both the Chattanooga Times and the Chattanooga News Free Press. Plaintiff was transferred to a janitorial position sometime in 2000, and her employment was terminated in January of 2004.

In July of 2004, Plaintiff filed this suit in the Hamilton County Chancery Court. In her complaint, Plaintiff claimed she was demoted in 2000 and then terminated in 2004 because of her age, her sex, and her handicap. Plaintiff also claimed that Defendant's employees continually harassed and mocked her because of her physical and mental disabilities. Plaintiff brought suit for handicap discrimination pursuant to the Tennessee Handicap Act ("THA"), Tenn. Code Ann. § 8-50-103. Plaintiff also brought claims for sex discrimination, age discrimination, and malicious harassment pursuant to the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 *et seq.* Plaintiff also sued for intentional and/or negligent infliction of emotional distress. Plaintiff sought compensatory and punitive damages, damages for embarrassment and humiliation, prejudgment interest, and attorney fees in a combined amount of not less than $750,000.

Defendant answered the complaint, generally denying the pertinent allegations and asserting that it had a legitimate and non-discriminatory reason for transferring Plaintiff in 2000, and also for terminating her employment in 2004. Defendant also alleged that Plaintiff failed to comply and cooperate with Defendant's internal investigatory procedures regarding her allegations of harassment.

Defendant filed a motion for summary judgment in October of 2004. Accompanying the motion was the affidavit of Byron Wooten ("Wooten"), Defendant's Human Resources Director. According to Wooten, Defendant had several video cameras installed on its premises for security purposes. One of these cameras was located on the second floor near the restrooms. Wooten explained that Defendant had experienced several instances of vandalism in the restrooms and hoped the camera would reveal the perpetrator. The vandalism involved the use of cleaning chemicals to create graffiti. Because Plaintiff was responsible for cleaning the restrooms and had ready access to cleaning chemicals, Defendant suspected Plaintiff may have been responsible for the graffiti. On January 8, 2004, the video camera captured Plaintiff obstructing the video camera with several different objects, including a broom, a box, and a Styrofoam cup. The video camera also captured

Plaintiff making a gesture toward the camera with her middle finger at least seven times.[1] When Defendant discovered what was on the surveillance tape, Wooten met with Plaintiff to discuss her actions. Plaintiff readily admitting hitting the camera with her broom, covering up the camera, and making several gestures with her middle finger. According to Wooten, following a complete investigation, Defendant's Vice President of Operations, Frank Anthony ("Anthony") made the decision to terminate Plaintiff's employment.

Defendant also filed Anthony's affidavit. According to Anthony, Plaintiff was transferred to a janitorial position in 2000 when her then current job was eliminated, along with the jobs of several other employees. Anthony stated the reorganization and job elimination was necessitated by a change in the production process. Rather than end Plaintiff's employment because her job no longer existed, Anthony decided to transfer Plaintiff to a janitorial position with no corresponding loss of pay or benefits. Anthony then discussed the reason Plaintiff was terminated in 2004. In short, the reason Anthony gave for terminating Plaintiff's employment was consistent with Wooten's affidavit, i.e., Plaintiff making obscene gestures toward the camera, hitting and covering up the camera, etc.

Plaintiff's deposition was taken prior to the hearing on Defendant's motion for summary judgment.[2] Plaintiff testified that she placed a Styrofoam cup over the camera because she wanted one hour without anyone watching her. Plaintiff also admitted first trying to cover up the camera with a box top, but when that did not work she placed a Styrofoam cup over the camera. Plaintiff testified the Styrofoam cup fit over the camera "like a glove." Plaintiff remembered "flipping them too" because she was stressed at work. Plaintiff claimed she was not aware of a vandalism problem, and in her opinion Defendant did not actually believe there was such a problem. According to Plaintiff, the alleged vandalism problem was Defendant's excuse so it could "spy" on her. Plaintiff reached this conclusion even though she admitted at her deposition to writing her name on the bathroom floor using cleaning chemicals. Plaintiff stated that her writing her name on the floor with chemicals "wasn't vandalism. It was somebody who knows how to clean the bathroom." Plaintiff, however, also admitted to making tic-tack-toe patterns on the floor with cleaning chemicals.

Plaintiff acknowledged that she was sent home on January 8, 2004, because she placed a cup over the camera. Plaintiff was called back to work later that afternoon and met with several of Defendant's representatives. At this meeting, Plaintiff stated that she covered up the camera because she did not want people watching her. Plaintiff was told she was being suspended pending an investigation and that she was being suspended for covering up the camera. At her

---

[1] At oral argument, Defendant displayed a very large blown-up picture of Plaintiff making this gesture with her middle finger toward the camera.

[2] By the time of this appeal, Plaintiff had abandoned her claim that she was improperly demoted to a janitorial position in 2000. Plaintiff also had abandoned all claims for sex and age discrimination. We will, therefore, limit our discussion of Plaintiff's deposition to her remaining claims at issue on appeal.

deposition, Plaintiff claimed Defendant was making up the reason for her suspension and Defendant did not really believe she had done anything wrong. Plaintiff stated Defendant was "faking it."

Plaintiff testified to the treatment she claimed created a hostile work environment. Plaintiff testified that a coworker told her that no one would date her. One or more of Plaintiff's coworkers told her than an employee named Daniel did not like her. Plaintiff testified that several of her coworkers did not like her. When asked why some of her coworkers did not like her, Plaintiff stated:

> A. [Because] no one likes them. They have to go out and find somebody to talk to. But me, they, they come to me.
>
> Q. So they don't like you because no one likes them?
>
> A. Yeah.…
>
> Q. I's asking you why they don't like you. You said because no one likes them, and I'm asking you is that the only reason?
>
> A. Yeah.

Plaintiff testified that she complained about harassment approximately three or four times. One of these complaints involved Plaintiff complaining that her supervisor was always around her and that he yelled at her. However, Plaintiff acknowledged that her supervisor yelled at the other employees as well, just not as much. Plaintiff testified that her supervisor yelled at her more because she fought back. Plaintiff also complained several years ago about being suspended. When asked why her supervisor suspended her, Plaintiff repeatedly stated that he suspended her because "he could." Plaintiff testified that she was bullied and made fun of primarily by two coworkers named Annette and Elizabeth. When asked why Plaintiff believed these coworkers bullied her, Plaintiff responded:

> A. [E]ven though I am crippled – guys like me, and I have a better body than they do. I have teeth. One of them don't have teeth.… Stuff like that. It's just like they're just jealous.…
>
> Q. Uh-huh. Okay. So if I understand correctly, Annette and Elizabeth–
>
> A. Are jealous.
>
> Q. Are jealous.
>
> A. That's what it is.

Plaintiff also acknowledged that after she complained about the way she was being treated by these two coworkers, they were instructed by Defendant to stop their behavior. While they did not completely stop being critical of Plaintiff, it slowed down and Plaintiff made no further complaints about their behavior.

Defendant has an Electronic Communication and Observation Policy (the "ECOP Policy") that was posted throughout its facility. This policy addresses the use of company computers, telephones, etc. As relevant to this appeal, the ECOP Policy provides as follows:

> All business equipment, including but not limited to computers, computer networks, telecommunications systems, surveillance systems and all communications and stored information transmitted, received or contained in the Company's business systems are the Company's property and are to be used for job-related purposes only. All users are obligated to use these resources responsibly, professionally, ethically, and lawfully.…

> The Company maintains electronic video surveillance of company property and stores electronic images from its surveillance for the safety and security of its employees, visitors and property. Employees should have NO expectation of privacy in work or public areas of the Company's property.…

> Violations of this policy will be taken seriously and may result in disciplinary action up to and including termination, and civil and criminal liability.

After reviewing the relevant evidence, the Trial Court granted Defendant's motion for summary judgment. Plaintiff appeals raising the following issues:

> I.      Was the Defendant motivated to terminate Joan Oates from her janitorial position because her disabilities limited her ability to walk, use her right arm, and communicate?

> II.     Did the Defendant create a hostile work environment where Joan Oates was harassed because of her physical and mental disabilities?

> III.    Did the Defendant's employees maliciously harass Joan Oates because she was disabled?

IV.    Is the Defendant responsible for intentionally or negligently causing Joan Oates emotional distress?

**Discussion**

In *Blair v. West Town Mall*, our Supreme Court recently reiterated the standards applicable when appellate courts are reviewing a motion for summary judgment. *Blair v. West Town Mall*, 130 S.W.3d 761 (Tenn. 2004). In *Blair*, the Court stated:

> The standards governing an appellate court's review of a motion for summary judgment are well settled. Since our inquiry involves purely a question of law, no presumption of correctness attaches to the lower court's judgment, and our task is confined to reviewing the record to determine whether the requirements of Tennessee Rule of Civil Procedure 56 have been met. *See Staples v. CBL & Assoc., Inc.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Cowden v. Sovran Bank/Central South*, 816 S.W.2d 741, 744 (Tenn. 1991). Tennessee Rule of Civil Procedure 56.04 provides that summary judgment is appropriate where: 1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and 2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *Staples*, 15 S.W.3d at 88.

> \* \* \*

> When the party seeking summary judgment makes a properly supported motion, the burden shifts to the nonmoving party to set forth specific facts establishing the existence of disputed, material facts which must be resolved by the trier of fact.

> To properly support its motion, the moving party must either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. If the moving party fails to negate a claimed basis for the suit, the non-moving party's burden to produce evidence establishing the existence of a genuine issue for trial is not triggered and the motion for summary judgment must fail. If the moving party successfully negates a claimed basis for the action, the non-moving party may not simply rest upon the pleadings, but must offer proof to establish the existence of the essential elements of the claim.

*Blair*, 130 S.W.3d at 763-64, 767 (quoting *Staples*, 15 S.W.3d at 88-89).

Our Supreme Court also has provided instruction regarding assessing the evidence when dealing with a motion for summary judgment, stating:

> The standards governing the assessment of evidence in the summary judgment context are also well established. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor. *See Robinson v. Omer*, 952 S.W.2d at 426; *Byrd v. Hall*, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the inferences to be drawn from the facts permit a reasonable person to reach only one conclusion. *See McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn. 1995).

*Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000).

We first address whether the Trial Court correctly determined that Defendant was entitled to summary judgment on Plaintiff's claim that her employment was terminated in violation of the Tennessee Handicap Act, which prohibits:

> discrimination in the hiring, firing and other terms and conditions of employment of the state of Tennessee or any department, agency, institution or political subdivision of the state, or of any private employer, against any applicant for employment based solely upon any physical, mental or visual handicap of the applicant, unless such handicap to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.

Tenn. Code Ann. § 8-5-103(a).

An individual alleging handicap discrimination under the THA must demonstrate: (1) that she was qualified for the position; (2) that she was disabled; and (3) that she suffered an adverse employment action *because of* that disability. *Barnes v. The Goodyear Tire and Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000)(emphasis added). For purposes of this appeal, we will assume that the first two elements have been met. As to the third element, it is undisputed that Plaintiff suffered an adverse employment action when she was terminated. The primary issue surrounds the causation aspect of the third element, i.e., whether Plaintiff was terminated "because of" her disability. In *Barnes*, our Supreme Court gave the following discussion on the causation aspect of the third element:

-7-

The third element of the analysis further requires a claimant to establish that a prohibited motivation made a difference in the adverse employment decision. There are two evidentiary methods for establishing this "but for" causation. A claimant may either use the direct method or the indirect method. *Matthews v. Commonwealth Edison Co.*, 941 F. Supp. 721, 724 (N.D. Ill. 1996). Under the direct method, the claimant simply relies on direct evidence of intentional discrimination. *See Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989) ("Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption."). Once direct evidence of intentional discrimination is shown, the burden shifts to the employer. The employer must then proffer a non-discriminatory reason which, when standing alone, would have induced the employer's action. *Wall v. Trust Co. of Ga.*, 946 F.2d 805, 809 (11th Cir. 1991); *see also Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1184 (6th Cir. 1996) (stating "no need" for further burden shift when direct evidence is available.).

The indirect method employs the burden-shifting analysis developed in *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981). The initial inquiry under the indirect burden-shifting analysis is whether the claimant can establish a prima facie case of disability discrimination. *Wolf v. Buss America*, 77 F.3d 914, 919 (7th Cir. 1996). A prima facie case of disability discrimination requires a showing that: (1) the claimant is a member of a protected class; (2) the claimant's work performance met the employer's legitimate expectations; (3) the claimant sustained an adverse employment action; and (4) employees not in the protected class were treated more favorably. *Matthews*, 941 F. Supp. at 724, 725; *Wolf*, 77 F.3d at 919. The elements of a prima facie case may vary depending upon the method of discrimination and the unique circumstances of each case. *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 775 (8th Cir. 1995). The establishment of a prima facie case shall create a rebuttable presumption of disability discrimination. *Wolf*, 77 F.3d at 919.

The next stage of the indirect method imposes a burden of production on the employer. If the claimant successfully establishes the prima facie case, the employer must articulate a legitimate non-discriminatory reason for the adverse employment action. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999). The articulation of a non-discriminatory reason rebuts the presumption of

discrimination and shifts the burden back to the claimant. *Id.* The last stage of the inquiry requires the claimant to show that the employer's proffered reasons for the employment decision were pretext for unlawful discrimination. *Id.* To establish pretext, the claimant can either show: (1) that the employer was more likely than not motivated by a discriminatory reason; or (2) that the employer's explanation was not credible. *Wolf*, 77 F.3d at 919.

*Barnes*, 48 S.W.3d at 708.

Since Plaintiff has no direct evidence that she was terminated because of her disability, she is proceeding under the indirect method outlined above. Assuming for present purposes only that Plaintiff did establish a prima facie case of discrimination, it is clear that Defendant met its burden of production by articulating a legitimate and non-discriminatory reason for Plaintiff's termination. The presumption of discrimination was, therefore, effectively rebutted. The burden then was on Plaintiff to show that Defendant's proffered reason for her termination was pretextual. To do this at the summary judgment stage, Plaintiff must create a genuine issue of material fact that either Defendant was more likely than not motivated by a discriminatory reason, or Defendant's explanation for Plaintiff's termination was not credible. *See Barnes*, 48 S.W.3d at 708.

Plaintiff argues there are two reasons why there is a disputed issue of material fact regarding Defendant's motivation for terminating Plaintiff. First, Plaintiff did not like being observed by the cameras because of her disabilities, and she never was specifically informed that she could not cover up the camera. Second, Plaintiff claims terminating her employment for what occurred on January 8, 2004, was altogether too severe and, because it was too severe, Defendant must have had discriminatory motives for the termination.

The cameras were installed by Defendant for security purposes and because of problems Defendant was having with graffiti in the bathrooms. Even if Defendant was not having these problems, Defendant had an absolute right to install security cameras in its hallways. Defendant did not install cameras in locations where only Plaintiff could be observed in an effort to "spy" on her. The cameras were in the hallways and anyone using those hallways would be observed. While we understand that Plaintiff, and any other employee for that matter, might not like being observed by the cameras, Plaintiff's dislike for the cameras offers nothing whatsoever toward establishing a discriminatory motive on the part of Defendant when terminating Plaintiff. Likewise, Defendant's failure to specifically tell Plaintiff that making obscene gestures toward the cameras and covering them up was prohibited does nothing toward showing a discriminatory motive. Defendant does not have to specifically tell an employee that making obscene gestures toward a security camera and covering that camera up is prohibited conduct as that goes without saying, especially given Defendant's ECOP Policy which was posted throughout its facility.

Plaintiff had been written up several times before the January 2004 incident. For example, in April of 2001, Plaintiff was disciplined for being insubordinate. In February and then September of 2002, Plaintiff was written up and even suspended for being insubordinate to her supervisor. In May of 2003, Plaintiff again was suspended for being insubordinate and warned that disrespectful behavior toward management would no longer be tolerated. Notwithstanding these warnings, Plaintiff proceeded in January of 2004, to make numerous obscene gestures to the security camera and hit and then cover up the camera. In short, we reject Plaintiff's argument that Defendant must have been improperly motivated in terminating Plaintiff's employment because that punishment was simply too harsh for what took place.

With regard to Plaintiff's claim that she was terminated in violation of the THA, when viewing the evidence in the light most favorable to Plaintiff, we conclude that Plaintiff failed to offer any evidence, circumstantial or otherwise, that her disability had any impact whatsoever on Anthony's decision to terminate her employment. It necessarily follows that Plaintiff has not established the existence of a genuine issue of material fact on this claim, and we affirm the Trial Court's judgment on this issue.[3]

The next issue is whether the Trial Court correctly granted summary judgment to Defendant on Plaintiff's hostile environment claim. In *Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579 (Tenn. Ct. App. 2004), this Court discussed the elements of a hostile environment disability discrimination claim as follows:

> A claim brought under the THA is analyzed under the same principles as those utilized for the Americans with Disabilities Act ("ADA"). *See, e.g., Roberson v. Cendant Travel Services, Inc.*, 252 F. Supp. 2d 573, 583 (M.D. Tenn. 2002)(citing *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn.2000)). To establish an ADA claim of hostile work environment based on disability, a plaintiff must prove that: (1) "[he] was disabled; (2) [he] was subject to unwelcome harassment; (3) the harassment was based on [his] disability; (4) the harassment unreasonably interfered with [his] work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures." *Trepka v. Bd. of Educ.*, No. 00-4063, 2002 WL 104801, at *4 (6th Cir. Jan. 24, 2002). To prove a hostile work environment, the employee must show conduct that is "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L.Ed.2d 295 (1993)(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 91

---

[3] In light of this conclusion, we pretermit Defendant's various arguments claiming Plaintiff failed to establish a prima facie case of discrimination.

L.Ed.2d 49 (1986)).  Conduct that is "merely offensive" does not rise to the level of that which will support a claim of hostile work environment.  *Id.*

*Sasser*, 159 S.W.3d at 584.

Plaintiff testified to a few specific incidents which she claims created a hostile environment.  Plaintiff testified that coworkers told her that no one would date her and that an employee named Daniel did not like her.  However, Plaintiff testified these comments were made by coworkers because these coworkers were not liked and no one would talk to them while people would talk to Plaintiff.  Thus, Plaintiff admits these comments were not made because of her disability.  Plaintiff also testified that she was ridiculed constantly by two coworkers named Annette and Elizabeth.  However, once again Plaintiff acknowledged that this ridicule was not because of her disability, but because they were jealous of Plaintiff because Plaintiff has "a better body than they do" and more teeth.  Plaintiff further claimed that her supervisor was "around her" a lot and yelled at her, but Plaintiff did not believe this took place because of her disability and even acknowledged that her supervisor yelled at the other employees.  If Plaintiff herself does not believe these incidents took place because of her disability, we are at a loss as to how she can claim that the Trial Court erred in granting summary judgment on her hostile environment claim.  Finding no genuine issue of material fact pertaining to Plaintiff's hostile environment claim, we affirm the Trial Court's judgment on this issue as well.

The next issue is whether the Trial Court erred in granting summary judgment on Plaintiff's malicious harassment claim.  In 1989, the Tennessee Legislature enacted Tenn. Code Ann. § 39-17-309 which criminalizes certain actions which intimidate others from exercising their civil rights.  This statute was passed because "it is the right of every person regardless of race, color, ancestry, religion or national origin, to be secure and protected from fear, intimidation, harassment and bodily injury caused by the activities of groups and individuals."  Tenn. Code Ann. § 39-17-309(a).  This criminal statute has a civil counterpart found at Tenn. Code Ann. § 4-21-701, which is the statute upon which Plaintiff brings her malicious harassment claim.

There have been several cases decided by this Court holding that a civil malicious harassment claim under Tenn. Code Ann. § 4-21-701 must be premised upon the specific categories set forth in the criminal statute, i.e., "race, color, ancestry, religion or national origin."  In *Levy v. Franks*, 159 S.W.3d 66 (Tenn. Ct. App. 2004), this Court discussed several of these cases including *Surber v. Cannon*, No. M1998-00928-COA-R3-CV, 2001 WL 120735 (Tenn. Ct. App. Feb. 14, 2001), *perm. app. denied July 2, 2001* (refusing to extend the reach of Tenn. Code Ann. § 4-21-701 to include claims of gender based harassment) and *Parr v. Middle Tenn. State Univ.*, No. M1999-01442-COA-R3-CV, 1999 WL 1086451, at *4 (Tenn. Ct. App. Dec. 3, 1999), *perm. app. denied May 15, 2000* (holding that a plaintiff failed to state a claim under § 4-21-701 when she alleged harassment on the basis of a disability).  After reviewing the applicable law, this Court in *Levy* upheld the trial court's dismissal of the plaintiff's malicious harassment claim which was not

premised upon harassment due to "race, color, ancestry, religion or national origin." *Levy*, 159 S.W.3d at 81.

Returning to the present case, Plaintiff's malicious harassment claim must fail for two reasons. First, harassment based on disability is not based on "race, color, ancestry, religion or national origin" and, therefore, is not covered by the civil statute. Second, even if harassment based on disability was covered by this civil statute, Plaintiff's own testimony shows that this claimed harassment was not based on her disability, but was based instead on other factors discussed at length above such as Plaintiff's having a "better body", etc. Accordingly, we affirm the Trial Court's judgment granting Defendant's motion for summary judgment on Plaintiff's malicious harassment claim.

The next issue is whether the Trial Court erred in granting Defendant summary judgment on Plaintiff's claims for intentional and/or negligent infliction of emotional distress. There are three essential elements to a cause of action for outrageous conduct or intentional infliction of emotional distress. These elements are: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). As discussed by the Court in *Bain*, this is not an easy burden to meet. According to *Bain*:

> [T]his Court has adopted and applied the high threshold standard described in the Restatement (Second) of Torts as follows:
>
> > The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Bain*, 936 S.W.2d at 622-23.

The *Bain* Court also discussed the tort of negligent infliction of emotional distress, stating:

> Recently, in *Camper v. Minor*, 915 S.W.2d 437 (Tenn. 1996), we revisited the tort of negligent infliction of emotional distress to consider the continuing viability of the "physical manifestation" or "injury" rule. Concluding that the rule had proven to be confusing, rigid, and inadequate in practice, we abandoned the physical injury rule and adopted instead the general negligence approach. *Id.*, 915 S.W.2d. at 446. To avoid summary judgment under the general negligence approach, a plaintiff must present material evidence as to each of the five elements of negligence – duty, breach of duty, injury or loss, causation in fact, and proximate, or legal cause. *Id.* Moreover, recovery is only appropriate for "serious" or "severe" emotional injury which is established by expert medical or scientific proof. *Id.*

*Bain*, 936 S.W.2d at 624.

Thus, both intentional infliction of emotional distress and negligent infliction of emotional distress require a showing of severe emotional injury. When the Trial Court granted Defendant's motion for summary judgment on these claims, it did so because Plaintiff failed to create a genuine issue of material fact as to whether she suffered severe emotional injury. The Trial Court added:

> The Plaintiff never sought or received any counseling or treatment for her alleged emotional distress and did not allege any way in which her emotional distress manifests itself. As such the record is completely devoid of evidence of a serious mental injury and summary judgment is appropriate.

On appeal, Plaintiff offers nothing to dispute this ruling of the Trial Court. Rather, Plaintiff argues there is a disputed issue as to whether the alleged harassment was severe enough to be covered by these torts. If there is no serious emotional injury, then it is irrelevant whether or not the alleged conduct is severe enough to be deemed negligent or even outrageous. The Trial Court concluded that Plaintiff failed to create a genuine issue of material fact as to whether she suffered any severe or serious emotional injury, and on appeal Plaintiff is unable to direct this Court to any evidence in the record which disputes this finding. Accordingly, we must affirm the Trial Court's grant of summary judgment to Defendant on these claims as well.

Due to our resolution of the above issues, any remaining issues raised by Defendant in its brief are pretermitted.

-13-

**<u>Conclusion</u>**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. Costs on appeal are taxed to the Appellant, Joan Oates, and her surety.

_____
D. MICHAEL SWINEY, JUDGE