IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 13, 2014 Session

## JOHNNY L. MILLER, ET AL. v. MIRANDA MORETZ, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 3-659-11      Deborah C. Stevens, Judge**

_____

**No. E2013-01893-COA-R3-CV-FILED-JULY 7, 2014**

_____

This appeal results from an automobile accident.  The plaintiffs filed a negligence action against the owner and driver of the vehicle that collided with them.  The jury that heard the matter concluded that the defendant driver was only 10 percent at fault, with the rest of the fault assessed to the plaintiff driver.  The trial court entered judgment on the  jury verdict for the defendants.  After a motion for a new trial was denied, the plaintiffs filed this appeal.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

R. Deno Cole, Knoxville, Tennessee, for the appellants, Johnny L. Miller and Margie L. Miller.

John T. Johnson and Brandon L. Morrow, Knoxville, Tennessee, for the appellees, Miranda Moretz and Travis K. Moretz.

**OPINION**

**I.  BACKGROUND**

On December 24, 2010, Johnny L. Miller, 72, was operating his new vehicle on Bell Campground Road in Powell, Tennessee, when he became involved in an accident with a vehicle owned by Miranda Moretz and operated by her younger brother, Travis K. Moretz (collectively, "the Moretzes").  Both parties were traveling westbound.  Mr. Miller and his

wife, Margie L. Miller (collectively, "the Millers"), eventually brought this action alleging that Mr. Moretz was guilty of the following: failing to yield the right-of-way; operating the vehicle at an excessive rate of speed given the circumstances; following too closely; and failing to give due regard to the rights and safety of others. The Millers also alleged that Mr. Moretz was guilty of negligence per se by violating Tennessee Code Annotated section 55-8-101, et seq. The Millers further asserted that Ms. Moretz was liable to them under the family purpose doctrine.[1] The Moretzes answered the complaint as follows:

> [T]he sole cause of the accident was the negligence of Plaintiff, Johnny Miller, who backed his vehicle into the side of the Defendants' vehicle as it was being driven by Defendant, Travis Moretz, in a safe and prudent manner. Specifically, Plaintiff, Johnny Miller, failed to keep a proper lookout, failed to keep his vehicle under control, and failed to yield the right-of-way. Plaintiff, Johnny Miller, also violated the provisions of [Tennessee Code Annotated section] 55-8-163, Limitations on Backing. . . .

Aaron Mase, the grandson of the Millers, testified at the trial. According to Aaron, 14 years old at the time of trial, he was looking out the living room window awaiting the arrival of his grandparents when he witnessed the accident:

> Q: [W]hat did you see happen?
>
> A: [Mr. Miller] started to slow down, brake lights came on, and he started to slowly back down into my driveway.
>
> Q: Okay. Did you see the rear brake lights come on?
>
> A: Yes.
>
> Q: And was it windy, rainy, dark, light, snowy? What were the weather conditions like?
>
> A: It was clear.

---

[1] The action was originally filed on February 14 or 24, 2011. In the initial complaint, there were no allegations that Mr. Moretz was impaired at the time of the accident. Approximately nine months thereafter, the Millers exercised their right under Rule 41.01 of the Tennessee Rules of Civil Procedure to take a voluntary nonsuit. The Millers refiled their cause of action against the Moretzes on December 19, 2011. Again, there were no allegations that Mr. Moretz was impaired.

Q: Was it still light outside?

A: Yes.

Q: And did you witness anything unusual after you saw him turn on his reverse lights?

A: Well, the car wreck happened.

Aaron asserted that his grandfather did not leave the right hand lane of Bell Campground Road, a two-laned road, when he started backing up into the driveway. However, he observed that the Moretz vehicle went between the car driven by Mr. Miller and the mailbox. Aaron stated further as follows:

Q: You saw your grandfather's car begin to back up?

A: Yes.

Q: At that point in time where was the Moretz vehicle?

A: Past him.

Q: When you say past him, what do you mean?

A: That's when they hit him. Like just about when he started to back up, that's when he hit him.

* * *

Q: Where was the Moretz Honda struck? What part of it was struck?

A: The driver's side.

* * *

Q: Now what part of your grandfather's car came into contact with the Moretz vehicle?

* * *

-3-

A: The back part of the car.

Q: Was it the rear corner of your grandfather's car?

A: Yes.

According to Aaron, Mr. Moretz was traveling about 35 to 40 miles per hour.[2]

Mr. Miller testified that he never crossed into the left lane before attempting to back into his daughter's driveway and that he did not cross into the left lane prior to attempting to back up on the evening in question. He stated that he was close to the middle of the road prior to backing up. According to Mr. Miller, the impact occurred just after he put his car in reverse, while he was still stopped and not moving. He claimed, "[Mr. Moretz] went off the shoulder of the road to the right. He hit me in the right rear and knocked me out into the middle of the street and shoved my car out and went between me and went on down the road and stopped five car lengths away." Significantly, Mr. Miller had no photographs of the alleged damage to his car.

Mr. Miller acknowledged that he experienced prior pains in his back and neck and that he had undergone a neck fusion prior to the accident. However, he claimed that his health was worse because of the wreck:

> [I]f I sit for any period of time or if I stand I get pains that go down my legs, but my back is hurting. And across my shoulders, if I sit for any period of time, if I like try to do maybe any kind of writing or anything like that, then I start having an intense pain come out of my neck and go across my shoulders inside.

Regarding pain and employment, Mr. Miller was asked on direct examination:

Q: Did you have that intense pain before the accident?

A: Not that, no.

Q: Okay. And were you employed before the accident?

A: Yes.

---

[2]No witnesses contradicted testimony that the speed limit on the road at issue was 30 miles per hour.

Q: And what were you doing before the accident?

A: I was in sales.

Q: Okay. And what kind of sales was that?

A: Cars.

Q: What did selling cars involve to your body, I guess?

A: Well, it's a tremendous amount of walking and you stay on your feet all the time. So you're staying on your feet about ten, twelve hours, you know. So it takes a lot of walking. And the other thing, it's not so much as a physical thing, but you do have some physical things that you have to do.

Mr. Miller testified that he had not been employed since the accident. He related that prior to the collision, he had liked to swim with his grandson but that he was now unable to engage in that activity because of the discomfort it would cause.

Mrs. Miller, 73 years old at the time of the trial, testified that she was in the backseat of the vehicle being driven by her husband at the time of the incident. She stated that their vehicle was "on the right lane at [her] daughter's driveway, just a little past [her daughter's] driveway, when [they] were hit in the right rear of the car and slammed into the road [whereupon the Moretz vehicle] went past [the Millers]." She opined how Mr. Moretz was able to hit the right rear of the Miller vehicle and avoid the mailbox and power pole on the right side of the right lane: "The reason that he got around on the right side, he hit the right rear of our car with his front end, which knocked our car over, and he went on – after he knocked us out in the street, he went past us and then in front of us." However, none of the pictures entered into evidence depict whether or not there was damage to the front of the Moretz vehicle. Mrs. Miller related that she did not hear any warning from the Moretz car.

In regard to injuries, Mrs. Miller did not receive any medical attention until two or three days after the accident and did not mention to anyone at the scene that she was hurt. She had been going to the chiropractor on a regular basis prior to the accident and stopped going three months after it occurred. Mrs. Miller testified that her pains got worse after the accident and that she has not been able to do yard work since the event. She further related that she has not been able to go for walks and it has become more difficult to vacuum and stand for long periods of time. Additionally, she observed that she has lost energy and the

desire to do anything since the accident.

Mr. Moretz, 29 years old at the time of trial, testified that at the time of the accident, he was driving his family on a trip to Blountville, Tennessee, to visit his grandmother. His 11-year-old nephew Isaac was in the passenger seat and his sister and mother, Carolyn Brown, were in the back seat. Mrs. Brown was seated directly behind him. Mr. Moretz stated that he was about 10 to 15 car lengths from the Miller vehicle when he first saw it. He claimed that he "wasn't driving fast," opining that he was going "probably" 35 miles per hour. Mr. Moretz admitted that he never took his foot off of the gas pedal from the time he first saw the Miller vehicle until the time of impact:

Q: Tell the jury from the time you saw the Miller vehicle stopped to the point of impact, tell us what happened.

A: When I saw it stopped, I just kept going. I was just proceeding on down the road. And then when I seen the reverse lights, I just started honking and got over to the right and kept going.

Q: And what happened?

A: I was – for me driving, I felt like I was at a point when I seen the reverse lights that I didn't want to stop right there because I figured he would hit the front of my car, so I just kept going. And we were just – I mean, he hit me right here, is pretty much where the cars hit together.

* * *

Q: So my question is, exactly where was the impact on your vehicle you were driving?

A: To the crack in – I mean, not crack, but – like where the driver's door is right here. I mean, the handle that you would open, I guess.

Mr. Moretz asserted that his lane was clear as he approached, with the Miller vehicle in the left lane. As he passed the Millers' car, it backed into the side of the Moretz vehicle. According to Mr. Moretz, the impact was not great and the Millers did not say anything about being hurt. He claimed there was no damage to the front of the Moretz vehicle.

Isaac Moretz, Mr. Moretz's nephew, the front seat passenger in the Moretz car, testified that he looked up when his uncle starting blowing the horn. He related that the

Miller vehicle was in the left lane and it backed up into the car driven by Mr. Moretz. Isaac stated the impact was on the driver's side door of the Moretz vehicle. He noted the right side wheels of their car went off the road a little trying to avoid the collision.

Miranda Moretz testified as to her observations regarding the accident:

A: [O]nce we realized that there was reverse lights coming, my brother started laying on the horn honking as we were coming up to that vehicle . . . . It's a two-lane. The car was kind of like this on the left side. Once we started seeing the reverse lights, it was moving and it was catty-corner but we were already coming up to it at that point.

* * *

Q: Tell the jury what portions of the vehicles [impacted] –

A: The damage that was on Mr. Miller's car, the backside of it came into the – behind the driver's side – where the driver's side door is, where he was – my brother was probably – it's where the doors open.

Right there where the driver's side door opens, going back to the back – my backdoor, where my mom was sitting. It was into where she was sitting on that side.

She noted the damage to the Millers' vehicle was on the corner of the passenger side bumper.

Dr. Charles H. Means, D.C., the Millers' chiropractor, testified regarding his treatment of both Mr. and Mrs. Miller after the accident. With regard to Mr. Miller, Dr. Means stated:

Q: Did you do anything differently for Mr. Miller [after the accident]?

A: On this specific date, we performed x-rays and that day, we did an examination on that day. We changed his treatment. We added an extra spinal adjustment, which means typically we had been doing adjustments to the neck and the back and we added doing extra spinal, meaning extremity adjustments, so we were adjusting his shoulders on both sides which we weren't doing before, and we also changed location of traction and electric stim modalities . . . from his low back to his neck.

Q: And what was the reason you had to do a different treatment plan for him

on December 30, 2010?

A: Well, he had an exacerbation from his motor vehicle accident.

Q: . . . [W]ere the injuries caused by the accident to a reasonable degree of chiropractic certainty, the automobile accident of December 24, 2010?

A: I believe so, yes.

Dr. Means testified that Mr. Miller's chiropractic treatments were necessary and that they totaled $2,856. He opined that Mr. Miller would be restricted in the areas of bending, lifting, twisting, standing, and prolonged sitting.

According to Dr. Means, Mrs. Miller's injuries also were caused by the automobile accident at issue to a reasonable degree of chiropractic certainty. He testified:

Q: And what caused the limitations to her back, based upon a reasonable degree of chiropractic certainty?

A: What made them worse was the motor vehicle accident we were speaking of.

* * *

Q: Is Mrs. Miller going to require future treatment due to the accident?

A: Yes, I believe so.

* * *

Q: Well, can you tell this jury within a reasonable degree of chiropractic certainty how often she should have to see you?

A: I would like to see her once a month, would be probably a good starting point.

Dr. Means related that both his treatment of Mrs. Miller and his charges in the amount of $497 were reasonable and necessary. Future chiropractic treatment, about once per month, would cost $120 per visit. On cross-examination, Dr. Means admitted that Mrs. Miller had fallen in September 2010, and had restrictions and limitations regarding standing, sitting, and

-8-

walking before the accident. He further divulged that when Mrs. Miller completed the case history update on January 4, 2011, she listed no new symptoms or conditions since her last visit in October 2011.

John McElligott, M.D., F.A.C.P., M.P.H., testified about his treatment of Mr. Miller. Dr. McElligott related that he had sent Mr. Miller to physical therapy. He opined that Mr. Miller's injuries were aggravated by the accident, and he observed that it is not unusual for a person injured (without any acute injury like a fracture) in an automobile accident to wait three or four days before going to the emergency room. He stated that the physical therapy charges in the amount of $1,070, his own charges in the amount of $3,463, the charges for the CT scans in the amount of $460 and the radiologist bills in the amount of $540.66 were reasonable and necessary.

## MOTION IN LIMINE

Prior to the trial, the Moretzes moved the court as follows:

1)   To prohibit the Millers from introducing any evidence whatsoever regarding drug use on the part of Mr. Moretz; and

2)  To prohibit the Millers from introducing any expert testimony regarding alleged drug use of Mr. Moretz.

In the motion in limine, the Moretzes argued:

There was no indication at the accident scene or in the accident report that Travis Moretz was impaired by the use of drugs or alcohol. . . . As is the case with consumption of alcohol, evidence of the mere consumption of a narcotic medication is not admissible in the absence of evidence of impairment. Defendants further say that even if evidence that Mr. Moretz had been prescribed a narcotic medication is relevant, such evidence would be unduly prejudicial and should be excluded pursuant to Rule 403 of the Tennessee Rules of Evidence. . . .

The complaint filed by the Millers did not contain any allegation that Mr. Moretz operated the vehicle while under the influence of a controlled substance. The Millers never filed a motion to amend the complaint to include such allegations. The trial court granted the motion without a written order being entered.

Pursuant to the ruling secondary to the motion in limine, the court would not permit Mr. Moretz to be impeached by prior inconsistent statement when he was asked, "[a]nd you swore under oath that you weren't on any prescription medication that day?" Relative to this question, the court observed:

> [T]here was a motion in limine to prevent any reference to the fact that [Mr. Moretz] had taken any drugs or whether or not he had taken any drugs or questions regarding it.

> * * *

> But I did rule that that testimony is excluded on the basis that we've talked about before, that there's been no evidence of impairment.

The court thereafter allowed the Millers to make an offer of proof by asking Mr. Moretz questions, outside the presence of the jury:

> Q: Mr. Moretz, you swore under oath twice before that you were not on any prescription medications at the time of the accident. Is that still true?

> A: No sir. I had taken a prescription medication.

> Q: At the time of the accident?

> A: Not at the time of the accident, but . . . [p]reviously that day, yes.

> Q: You had taken prescription medications that day?

> A: Yes, sir.

> * * *

> Q: . . . What prescription medication did you take the day of the accident?

> * * *

> A: Oxycodone.

Mr. Moretz elaborated that his personal physician had informed him that he "was able to drive" and provided a letter for his employer reflecting that fact. The Millers offered an additional offer of proof by highlighting Mr. Moretz's prior inconsistent statements regarding

drug use on the day of the accident, made under oath in interrogatories:

> The question in his interrogatory responses and his answer, "State whether or not you had consumed any alcoholic beverages or taken any drugs or medications within twelve hours before the occurrence of this accident described in this complaint. Answer: No." These are interrogatory responses that Mr. Moretz signed under oath on July 7, 2011.

The court reiterated its ruling on the matter by observing:

> THE COURT: . . . In both cases I believe that – there has been no testimony, no evidence, any indication that Mr. Moretz was impaired at the time and, therefore, any questions regarding his drug use would be prejudicial and I would, even despite his answer and whether or not it's correct with regard to the interrogatories, I continue to rule that that information is not admissible.

> * * *

> MR. COLE: I just wanted to add that he was asked also in his deposition if he had been taking prescription medications and he said no in his deposition as well. So we've got a prior inconsistent statement that I wasn't able to show, but this gentleman –

> THE COURT: And, again, my position on that would be that the prior inconsistent statement and the testimony with regard to that would be prejudicial, and its prejudicial value outweighs the probative value and that it should not come before the jury.

> So at this point in time I'm going to rule that evidence as not admissible. And you have preserved your record on many levels and we'll move on from here. Thank you.

After the testimony concluded at trial, Ms. Moretz moved for a directed verdict on the ground that the family purpose doctrine was inapplicable. The court granted the motion and dismissed all causes of action against Ms. Moretz. Subsequently, the jury returned a verdict finding Mr. Moretz to be 10 percent at fault, Mr. Miller to be 90 percent at fault, and Mrs. Miller's damages to total zero. The verdict was memorialized in a judgment on April 30, 2013. The Millers filed a motion for a new trial or to suggest additur as to Mrs. Miller. After a hearing on July 19, 2013, the trial court entered an order three days later denying the Millers' motion. The Millers filed a timely notice of appeal.

## II. ISSUES

The Millers raise the following issues on appeal:

A.  Did the trial court err in excluding evidence of Mr. Moretz's use of oxycodone on the day of the accident in question, relevant to his degree of fault in the accident.

B.  Did the trial court err by prohibiting the Millers from impeaching Mr. Moretz with his own prior inconsistent sworn statements under oath that he had not used oxycodone at the time of the accident.

C.  Did the trial court abuse its discretion by failing to suggest an additur or in the alternative grant a new trial in order to correct an unreasonable finding by the court.


## III. STANDARD OF REVIEW

The proper standard of review regarding an appeal of a jury's verdict is as follows:

In reviewing a properly approved jury verdict, an appellate court may set aside findings of fact by a jury in civil actions "only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d).  In determining whether "there is material evidence to support the jury verdict, we 'take the strongest legitimate view of all the evidence in favor of the verdict, assume the truth of all evidence that supports the verdict, allow all reasonable inferences to sustain the verdict, and discard all countervailing evidence.'" *Barkes v. River Park Hosp., Inc.*, 328 S.W.3d 829, 833 (Tenn. 2010) (quoting *Whaley v. Perkins*, 197 S.W.3d 665, 671 (Tenn. 2006)).

*Wilson v. Americare Sys., Inc.*, 397 S.W.3d 552, 558 (Tenn. 2013).  In *Creech v. Addington*, 281 S.W.3d 363 (Tenn. 2009), the Court further noted:

"Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies."  If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Id.* at 372 (citations omitted).

Our standard of review of the trial court's evidentiary rulings is whether the court abused its discretion. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). A trial court "abuses its discretion only when it 'applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). This standard of review does not permit the appellate court to substitute its judgment for that of the trial court. *Eldridge*, 42 S.W.3d at 85 (citing *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)). Rather, the abuse of discretion standard "'reflects an awareness that the decision being reviewed involved a choice among several acceptable alternatives,' and thus 'envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal.'" *Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010) (quoting *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)).

## IV. DISCUSSION

### A.

The Millers argue that the trial court erred in excluding evidence of Mr. Moretz's use of oxycodone on the day of the accident in question. They assert that their right to have a proper trial was impeded when the trial court prevented relevant expert testimony concerning Mr. Moretz's reaction time, impaired secondary to oxycodone use on the day of the accident, from being heard by the jury. The Millers contend that even if the jury believed Mr. Moretz's version of how this accident occurred, the jury could have found Mr. Moretz to be more than 50% at fault for his failure to properly and timely react (by coming to a stop or taking other appropriate measures) to the Millers' vehicle prior to impact.

Relevant evidence is defined by Rule 401 of the Tennessee Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In other words, evidence is relevant if it helps the trier of fact resolve an issue of fact." Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-9 (5th ed. 2005). "Evidence which is not relevant is not admissible." Tenn. R. Evid. 402. If the evidence is relevant, it is admissible unless another legal rule excludes it. Tenn. R. Evid. 402.

Under Rule 403 of the Tennessee Rules of Evidence, the trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

-13-

delay, waste of time, or needless presentation of cumulative evidence." This rule requires trial courts to conduct a two-part balancing test. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 1999). First, the trial court must balance the probative value of the challenged evidence against the countervailing factors. *Id.* If it finds that the prejudice substantially outweighs the probative value, the trial court may exercise its discretion and exclude the evidence. *Id.*

The trial court is best situated to conduct the Rule 403 balancing test. Assuming, without deciding, that the oxycodone evidence was relevant, its probative value on any issue was minimal. There was no evidence that Mr. Moretz was driving erratically or that oxycodone use affected his driving or contributed to the collision. As there is no evidence that the drug was a causative factor in the accident, evidence of this nature would undoubtedly pose a great risk of allowing the jury to decide the case on purely emotional grounds based on general contempt for drug use. *See* Cohen, et al., <u>Tennessee Law of Evidence</u> § 4.03[6], at 4-64 (5th ed. 2005). Accordingly, we find the trial court did not abuse its discretion in precluding the oxycodone evidence pursuant to Rule 403. Under all the attendant circumstances, whether the trial court should have permitted the expert to testify lay within its discretion. *See Otis*, 850 S.W.2d at 443. We find no abuse of that discretion by the trial court. As our review of this record reveals that the Millers had no factual evidence to demonstrate that Mr. Moretz's use of a prescription drug resulted in any impairment, any error in prohibiting evidence was therefore harmless because it would not have impacted the outcome of the trial. *See* Tenn. R. App. P. 36(b).

**B.**

Additionally, the Millers sought to impeach Mr. Moretz with his prior inconsistent statement that he had not used oxycodone at the time of the accident. The Millers assert that had they been afforded their right to impeach Mr. Moretz, they would have argued T.P.I. – Civil 2.22 to the jury, which states, "You may conclude that a witness deliberately lied about a fact that is important to your decision in the case. If so, you may reject everything that the witness said."

As we indicated previously, due to the danger of unfair prejudice, the trial court did not abuse its discretion in refusing to allow impeachment on the basis of the prior inconsistent statements. Even if the ruling was incorrect, any error was harmless, as the testimony of the Millers' grandson, in addition to that of all the passengers in the Moretz vehicle, supports in substantial measure that of Mr. Moretz. We therefore find no error by the trial court in prohibiting impeachment.

## C.

The Millers contend that we should reverse the judgment of the trial court regarding Mrs. Miller's judgment for $0 in damages and remand this case for a hearing on additur or for a new trial on the issue of damages. They assert that, upon a reasonable view of the case, the jury verdict is inconsistent and unreasonable, because there is no evidence to support the jury's verdict that Mrs. Miller did not incur some amount of damage.

In personal injury cases, the amount of damages to be awarded is primarily for the jury to determine. *Brown v. Null*, 863 S.W.2d 425, 430 (Tenn. Ct. App. 1993). It is not within the appellate court's province to substitute its judgment for that of the jury. *Id.* Furthermore, when the trial judge has approved a verdict, as in this case, our review is subject to the rule that if there is any material evidence to support the jury's award, it should not be disturbed. *E.g., Ellis v. White Freightliner Corp.*, 603 S.W.2d 125, 129 (Tenn. 1980). To determine if material evidence supports the jury's verdict, the appellate court shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co., Inc. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)).

Reviewing the evidence, we conclude that there is material evidence supporting the jury's finding on the issue of the comparative fault of the parties. The individuals in the vehicles related their accounts of the accident. The jury could reasonably conclude from the testimony the fault it determined. Accordingly, we hold that the verdict was proper and decline to set it aside or grant an additur. On appeal, the Millers have not pointed to any evidence in the record to show the jury's finding was improper.

## V. CONCLUSION

The judgment of the trial court is affirmed and this cause is remanded to the trial court for such further proceedings as may be required, if any, consistent with this opinion, and for collection of costs. The costs on appeal are assessed against the appellants, Johnny L. Miller and Margie L. Miller.

_____
JOHN W. McCLARTY, JUDGE