Treasa M. RHOADS, Plaintiff–
Appellant,

v.

BOARD OF EDUCATION OF MAD
RIVER LOCAL SCHOOL DISTRICT,
and Alex J. Dinino, Defendants–Appel-
lees.

No. 03–3018.

United States Court of Appeals,
Sixth Circuit.

July 8, 2004.

Joanne Jocha Ervin, Dayton, OH, for Plaintiff–Appellant.

Nicholas Edward Subashi, Subashi, Wildermuth & Ballato, Lynnette P. Ballato, Law Office of Nicholas E. Subashi, Dayton, OH, for Defendant–Appellees.

Before SUHRHEINRICH, GIBBONS, and SUTTON, Circuit Judges.

GIBBONS, Circuit Judge.

Plaintiff-appellant Treasa M. Rhoads resigned from her position as a school bus driver for defendant-appellee Board of Education of Mad River Local School District ("District") on April 15, 1999, after failing a random drug test administered by the District. Rhoads attempted to reacquire her position on several occasions, but the District refused to rehire her. She subsequently filed suit against the District and

defendant-appellee Alex J. DiNino, who was then the District's Assistant Superintendent of Personnel. She alleged in part that the District discriminated against her on the basis of a disability in violation of Ohio Rev.Code § 4112.02 and that DiNino deprived her of her Fourteenth Amendment right to due process in violation of 42 U.S.C. § 1983. The district court granted summary judgment to defendants on each of Rhoads's claims, which she now appeals. For the following reasons, we affirm the district court's grant of summary judgment to defendants.

## I.

Rhoads began working for the District as a school bus driver in 1977 and continued in that capacity until she resigned in 1999. While employed with the District, she belonged to Local 342 of the Ohio Association of Public School Employees, AFSCME, AFL–CIO ("Union").

Pursuant to the Omnibus Transportation Employee Testing Act of 1991, 49 U.S.C. § 31306 ("OTETA"), employers must randomly test employees who are commercial motor vehicle drivers for controlled substance abuse.[1] 49 C.F.R. § 382.305. An employer must not allow any employee who fails such a test to perform any safety-sensitive function, which includes driving a commercial motor vehicle. *Id.* § 382.501; *see also id.* § 40.23(a) ("As an employer who receives a verified positive drug test result, you must immediately remove the employee involved from performing safety-sensitive functions."); *id.* § 382.215 ("No employer having actual knowledge that a driver has tested positive ... for controlled substances shall permit the driver to perform or continue to per-

---

1. It is undisputed that, as a school bus driver, Rhoads was a commercial motor vehicle driv-

er as defined by 49 C.F.R. § 382.107.

form safety-sensitive functions."). Likewise, an employee who tests positive for a controlled substance may not return to performing safety-sensitive functions for any employer until she satisfies the requirements of 49 C.F.R. § 40.281 to 40.313, which include acquiring substance abuse counseling and ceasing use of controlled substances. *Id.* § 382.503.

In accordance with these requirements, the District adopted a policy for randomly testing bus drivers for controlled substance abuse. The policy provides that bus drivers "shall be selected for random alcohol and controlled substance testing." If a random test reveals that a driver uses a controlled substance and has nonetheless reported for duty, the policy stipulates that the driver will be terminated and "shall be immediately removed from duty."

Rhoads failed a random drug test administered by the District on April 13, 1999, after she returned from transporting disabled children to school. On April 15, 1999, the doctor who conducted the test notified Rhoads that she had tested positive for use of cannabinoids, commonly known as marijuana. The doctor also informed her that he would notify DiNino of the results. After her conversation with the doctor, Rhoads met with DiNino in his office at approximately 9:45 a.m. He had just been informed that Rhoads failed the drug test. Rhoads began the meeting by requesting health leave so that she could enter drug rehabilitation. DiNino refused Rhoads's request and informed her that she would have to be terminated for failing the drug test. She replied by stating that she did not want to be fired, and she asked that she be allowed to resign instead. According to Rhoads, DiNino then granted her the option of resigning or being terminated, after which Rhoads left his office. She acknowledges that during the meeting she never denied using illegal drugs.

At approximately 1:30 p.m., Rhoads telephoned DiNino and inquired about the option of retiring. He stated that she was too young to retire and that, if she did not want to be terminated, she would have to resign by 5:00 p.m. Later that day, she submitted a signed, handwritten resignation dated April 15, 1999, which read: "Effective today I, Treasa Rhoads, resign from Mad River Schools as a bus driver." A time-stamp reflects that the District received the letter at approximately 3:55 p.m.

At a special meeting on April 21, 1999, the District approved Rhoads's resignation, effective April 15, 1999. In a letter dated April 22, 1999, DiNino notified Rhoads of this decision. Rhoads initiated a grievance under the applicable Collective Bargaining Agreement ("CBA") that same day. In her grievance, she asserted that she had been constructively discharged, that the District failed to handle her failure of the drug test in the proper manner, and that she was entitled to have her job back. On April 26, 1999, the District denied Rhoads's grievance.

Rhoads wrote to the District's supervisor—Dennis Morrison—on April 27, 1999, and informed him that she wished to withdraw her resignation. The District refused to allow her to do so or to return to work. The next day, Rhoads wrote a letter to Morrison indicating that she wished to proceed to Step III of the grievance process under the CBA. The District honored this request and conducted a hearing on April 30, 1999, to evaluate Rhoads's claims. On May 7, 1999, her grievance was again denied. Rhoads made one last effort to pursue her grievance by seeking to take the matter to arbitration, but the Union—which held the exclusive right to pursue arbitration on her behalf—declined to do so.

At some point in June 1999, Rhoads learned that the District was seeking to hire a school bus driver. She approached Morrison to express an interest in the position and to notify him that she was seeking counseling for her drug use, but he told her that she would not be rehired. Rhoads made a second attempt to obtain employment with the District in November 1999, and the District again declined to rehire her.

On January 29, 2000, Rhoads filed suit against defendants in Ohio state court. She alleged *inter alia* that, in refusing to rehire her, the District discriminated against her on account of a disability in violation of Ohio Rev.Code § 4112.02. She also presented a 42 U.S.C. § 1983 claim against DiNino for violating her due process rights under the Fourteenth Amendment. On February 23, 2000, the case was removed to the United States District Court for the Southern District of Ohio pursuant to 28 U.S.C. § 1441.

On April 26, 2002, Rhoads filed a motion for summary judgment on her § 1983 claim. Defendants, in turn, filed a cross-motion for summary judgment on all of Rhoads's claims. On November 27, 2002, the district court granted summary judgment for defendants on Rhoads's claims and denied Rhoads's motion for summary judgment. The court found that, although Rhoads presented sufficient indirect evidence to support a prima facie case of disability discrimination, she could not show that the District's justification for refusing to rehire her was pretextual. With respect to her due process claim, the court held that Rhoads resigned her position voluntarily and therefore could not show that DiNino deprived her of it. Rhoads filed a timely notice of appeal.

## II.

We review a district court's grant of summary judgment *de novo*. *Abbott v.*

*Crown Motor Co.*, 348 F.3d 537, 539 (6th Cir.2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When evaluating a motion for summary judgment, we view the evidence in the light most favorable to the non-moving party. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 613 (6th Cir.2003). Ultimately, the question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A.

Ohio Rev.Code § 4112.02(A) prohibits employers from refusing to hire someone on account of a disability. A plaintiff may prove disability discrimination under § 4112.02(A) with either direct or indirect evidence. *See Markham v. Earle M. Jorgensen Co.*, 138 Ohio App.3d 484, 741 N.E.2d 618, 627 (2000). As a general matter, Ohio courts look to federal regulations and case law interpreting the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101—12203, for guidance when applying Ohio disability discrimination laws. *City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St.3d 569, 697 N.E.2d 204, 206–07 (1998).

The district court analyzed Rhoads's discrimination claim as one based on indirect evidence. On appeal, she asserts that the court should have instead analyzed the claim as one based on direct evidence. Regardless of whether we view

Rhoads's claim as one based on direct or indirect evidence, it fails because she has not produced evidence sufficient to demonstrate that her drug use constituted a disability.

A plaintiff pursuing a disability discrimination claim under § 4112.02 must demonstrate that she is disabled irrespective of whether she seeks to support her claim with direct or indirect evidence. *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452–53 (6th Cir.2004). A disability is

> a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment.

Ohio Rev.Code § 4112.01(A)(13).[2] Ascertaining whether a plaintiff is disabled requires an individualized inquiry into her particular condition and its affect on her ability to perform a major life activity. *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); *see also* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

Under Ohio law, drug addiction is a "physical or mental impairment." Ohio Rev.Code § 4112.01(A)(16)(a)(iii). Hence, an individual with a drug addiction that substantially limits her ability to perform a major life activity, or with a record of such an impairment, or who is regarded as having a drug addiction that so limits her ability to function will be classified as disabled under Ohio law.[3] *See, e.g., Thomp-*

---

**2.** The express wording of the statute suggests that a disability may exist merely if an individual has a record of a physical or mental impairment or is regarded as having a physical or mental impairment, regardless of whether the impairment at issue substantially limits a major life activity. However, it is clear that, "[u]nder both federal regulations and Ohio code, a 'disability' is an impairment, physical or mental, which substantially limits one or more of an individual's major life activities, a record of *such* impairment, or being regarded as one having *such* an impairment." *Ferguson v. Lear Corp.*, 155 Ohio App.3d 677, 802 N.E.2d 1141, 1148 (2003) (emphasis added).

**3.** Notably, "a disability does not include any psychological disorder or condition, mental or psychological disorder, or disease or condition caused by an illegal use of any controlled substance by an employee, applicant, or other person, if an employer ... acts on the basis of that illegal use," Ohio Rev.Code § 4112.02(Q)(1)(a), unless

> (i) The employee, applicant, or other person has successfully completed a supervised drug rehabilitation program and no longer is engaging in the illegal use of any controlled substance, or the employee, applicant, or other person otherwise successfully has been rehabilitated and no longer is engaging in that illegal use[;]

> (ii) The employee, applicant, or other person is participating in a supervised drug rehabilitation program and no longer is engaging in the illegal use of any controlled substance[; or,]

> (iii) The employee, applicant, or other person is erroneously regarded as engaging in the illegal use of any controlled substance, but the employee, applicant, or other person is not engaging in that illegal use.

*Id.* § 4112.02(Q)(1)(b); *see also id.* § 4112.01(A)(16)(b) (" 'Physical or mental impairment' does not include ... [p]sychoactive substance use disorders resulting from current illegal use of a controlled substance."). As will be shown, Rhoads does not present evidence sufficient to show that her drug use was a disability-as defined by § 4112.01(A)(13). Consequently, whether Rhoads stopped using marijuana illegally and whether she completed or was participating in a supervised drug rehabilitation program, so that her previous illegal use could nonethe-

*son v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002) ("Drug addiction *that substantially limits one or more major life activities* is a recognized disability under the ADA.") (emphasis added); *Buckley v. Consol. Edison Co.*, 127 F.3d 270, 274 (2d Cir.1997) (stating that, to prove that a history of drug or alcohol addiction constituted a record of a disability under ADA, a plaintiff "must demonstrate that he was actually addicted to drugs or alcohol in the past, and that this addiction substantially limited one or more of his major life activities"). A plaintiff cannot prove that her drug use amounts to a disabling addiction merely by providing self-serving, conclusory statements that her drug use substantially limits her ability to perform a major life activity. *Cervella v. Lake County Bd. of Comm'rs*, No. 95–L–094, 1996 WL 648836, at *3 (Ohio Ct.App. June 14, 1996). Rather, "[a]t a minimum, medical evidence must be offered to substantiate the claimed [disability]." *Id.* Moreover, an employer who has knowledge of an employee's or applicant's drug use—but does not perceive that use as substantially limiting that person's ability to perform a major life activity—does not regard that person as having a disability. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 311 (6th Cir.2000).

Rhoads has produced scant medical evidence that she suffered from a drug addiction. Instead, she relies primarily on her own testimony that she believes she was a drug addict when she used marijuana, that she began using the drug at age sixteen, and that sometimes she smoked marijuana all day long. Yet, even assuming Rhoads could show that she once suffered from a drug addiction, she presents no evidence indicating to what extent the addiction affected her ability to perform a major life activity. Thus, Rhoads has failed to bring

less evidence a disabling drug addiction pur-

forth evidence adequate to prove that she was actually disabled when the District refused to hire her or that she had a record of a disability at that time. Nor has she produced evidence that shows the District regarded her drug use as a disability. Although the random drug test certainly put the District on notice that she used controlled substances, there is no indication that the District regarded Rhoads as a drug addict or that it was aware of the extent of her use of marijuana. Nor does any evidence suggest that the District believed her drug use substantially limited her ability to perform a major life activity.

In sum, Rhoads has failed to meet her burden of producing evidence sufficient to prove that she is "disabled" under § 4112.02. Therefore, she cannot succeed in bringing a disability discrimination claim on the basis of either direct or indirect evidence.

The district court, of course, concluded that Rhoads had met this burden. However, this conclusion was in error. The court considered only whether Rhoads presented evidence that she had a record of drug use and whether she was using drugs at the time the District refused to rehire her. It apparently presumed that § 4112.01(A)(16)(a)(iii) defined drug addiction as a *per se* disability. On the contrary, the provision only defines drug addiction as a physical or mental impairment. Whether an individual with that physical or mental impairment has a disability is a separate question answered only by an individualized inquiry into whether the impairment substantially limits the ability of that person to perform a major life activity, whether the impairment has so limited the individual historically, or whether the individual is regarded as being so limited

suant to § 4112.02(Q)(1)(b), are irrelevant.

by such an impairment. *See* Ohio Rev. Code § 4112.01(A)(13); *Miller,* 737 N.E.2d at 600. The court's failure to conduct this inquiry led it to the erroneous conclusion that Rhoads met her burden of presenting sufficient evidence to demonstrate a disability.

Nonetheless, we affirm the district court's grant of summary judgment to the District on Rhoads's discrimination claim on the basis that she has failed to present evidence sufficient to demonstrate that she is disabled. We do not reach the issue of whether the nondiscriminatory justification offered by the District for its actions is pretextual. *See Kennedy v. Superior Printing Co.,* 215 F.3d 650, 655 (6th Cir. 2000) ("[B]ecause a grant of summary judgment is reviewed *de novo,* this court may affirm the judgment of the district court on any grounds supported by the record, even if they are different from those relied upon by the district court.").

## B.

■ Rhoads next asserts that the district court erred in failing to find that she presented sufficient evidence to proceed on her § 1983 claim against DiNino. To succeed on a § 1983 claim, a plaintiff must show that the defendant, while acting under the color of state law, deprived her of a right secured by the federal constitution or by federal law. *Markva v. Haveman,* 317 F.3d 547, 552 (6th Cir.2003). Rhoads claims that DiNino, acting under the color of state law, deprived her of her Fourteenth Amendment right to procedural due process. The parties do not dispute that DiNino was acting under the color of state law during his interactions with Rhoads. The parties do dispute, however, whether DiNino deprived Rhoads of her constitutional right to due process.

To succeed on a procedural due process claim under § 1983, a plaintiff must show that she possessed a property interest protected by the due process clause of the Fourteenth Amendment and that she was deprived of this interest by the defendant without being afforded sufficient process. *Hahn v. Star Bank,* 190 F.3d 708, 716 (6th Cir.1999).

Rhoads's first hurdle, then, is to demonstrate that DiNino deprived her of a protected property interest. The parties agree that Rhoads possessed a property interest in continued employment pursuant to Ohio Rev.Code § 3319.081. But DiNino asserts, and the district court agreed, that Rhoads could not show that he deprived her of this interest because she resigned her position voluntarily. On this basis, the court overruled Rhoads's motion for summary judgment on her § 1983 claim and granted DiNino's contrary motion.

On appeal, Rhoads argues that she did not resign voluntarily. A public employee with a property interest in continued employment is deprived of that interest by her employer if the employer constructively discharges her by forcing her to resign involuntarily. *See Parker v. Bd. of Regents,* 981 F.2d 1159, 1162 (10th Cir.1992); *accord Leheny v. City of Pittsburgh,* 183 F.3d 220, 227–28 (3d Cir.1999); *Hargray v. City of Hallandale,* 57 F.3d 1560, 1567–69 (11th Cir.1995); *Angarita v. St. Louis County,* 981 F.2d 1537, 1544 (8th Cir.1992); *Stone v. Univ. of Md. Med. Sys. Corp.,* 855 F.2d 167, 173 (4th Cir.1988). However, if a plaintiff resigns of her own free will, even as a result of the defendant's actions, then she voluntarily relinquishes her property interest in continued employment, and the defendant cannot be found to have deprived her of that interest without due process of law. *See, e.g., Yearous v. Niobrara County Mem'l Hosp.,* 128 F.3d 1351, 1356 (10th Cir.1997).

In general, employee resignations are presumed to be voluntary. *Leheny,* 183 F.3d at 227. An employee may rebut this presumption by producing evidence indicating that the resignation was involuntarily procured. *Id.* Whether an employee's resignation was involuntary depends upon whether an objectively reasonable person would, under the totality of the circumstances, feel compelled to resign if he were in the employee's position. *Yearous,* 128 F.3d at 1356. Relevant to this inquiry are "(1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice [she] was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation." *Lenz v. Dewey,* 64 F.3d 547, 552 (10th Cir.1995). The mere fact that an employee is forced to choose between resignation and termination does not alone establish that a subsequent choice to resign is involuntary, provided that the employer had good cause to believe there were grounds for termination. *Parker,* 981 F.2d at 1162. On the other hand, an employee resigns involuntarily if, after being given a choice between resignation and termination, she is not granted sufficient time and opportunity to deliberate about the choice. *Dusanek v. Hannon,* 677 F.2d 538, 543 (7th Cir.1982).

In Rhoads's case, the District presented her with a choice between termination—which was required under the District's policy because she had tested positive for marijuana—and resignation. Indeed, she obtained the option of resignation at her own request, suggesting that the ultimate decision to resign was preferable to her and of her own choosing. Second, the fact that she requested the option of resigna-

tion in lieu of termination also indicates that she understood the choice presented to her. Third, according to Rhoads's account, DiNino gave her between approximately 10:00 a.m. and 5:00 p.m. on April 15 to choose between the two options. Although this time frame was perhaps not as lengthy as Rhoads would have liked, she was not pressured to make her decision immediately or otherwise coerced into making an uninformed judgment. Finally, it is unclear whether Rhoads had discretion to select the effective date of her resignation. It could certainly be concluded that she did not, considering that she was given until 5:00 p.m. on April 15 to resign and that the resignation submitted that day states that it was effective immediately.

■ In light of the presumption that resignations are voluntary, a jury could not conclude on the basis of the evidence presented that a reasonable person would, if in Rhoads's position, feel compelled to resign. Although DiNino presented Rhoads only with a choice between resignation and termination, the results of her drug test gave him good cause to believe that she was subject to termination. He provided her a reasonable amount of time to deliberate meaningfully about the choice, the ramifications of which she clearly understood. Furthermore, Rhoads herself requested the option of resignation, indicating that the ultimate decision to resign was one of her choosing. In conclusion, Rhoads cannot show that her resignation was involuntary. Therefore, she also cannot succeed in demonstrating that DiNino deprived her of her protected property interest in continued employment.[4]

■ Even assuming Rhoads's resignation was a deprivation of a protected prop-

---

4. Rhoads argues that, if her resignation was voluntary, she had thirty days to withdraw it pursuant to Ohio Rev.Code § 3319.081(E),

which provides that "[a]ny nonteaching school employee may terminate his contract of employment thirty days subsequent to the

erty interest because it was involuntary, her due process claim fails because she cannot show that she was denied sufficient process.

The CBA provides: "A disciplinary action to ... terminate the employment contract of an employee may be appealed through the provisions of the grievance procedure. This appeal shall be the exclusive appeal remedy for such actions, and shall be in lieu of the provisions of [Ohio Rev.Code § 3319.081]." The CBA then describes a four-step grievance procedure. At Step I, the employee discusses her grievance with her supervisor. If she is not satisfied with the result, at Step II she can present a written grievance to the supervisor, who will review the grievance and provide a written reply. If the written reply is unsatisfactory, the employee may seek an informal hearing to be presided over by the Superintendent or his designee, which constitutes Step III. Finally, if the employee is unsatisfied with the resolution at Step III, the Union may pursue the employee's grievance at arbitration—Step IV.

Rhoads challenged her termination through Step III of the process, which involved an informal hearing presided over by DiNino at which she was permitted to testify and present evidence, and at which

---

filing of a written notice of such termination with the treasurer of the board." According to Rhoads, this provision means that any resignation by a nonteaching school employee is not effective until thirty days after it is filed. A more reasonable interpretation of § 3319.081(E), and the one that we adopt, is that a non-teaching school employee may unilaterally terminate a contract with a school district thirty days after providing notice; however, by mutual agreement, the board of education for which the employee works and the employee may agree to terminate the contract at any time. Such an interpretation is supported by the fact that the provision governing the ability of teachers to terminate their contracts stipulates that they may do so only under certain circumstances unless the board of education for which they work consents to the termination. See Ohio Rev.Code § 3319.15. The interpretation also conforms with the general principle of Ohio law that the resignation of public employees is effective upon acceptance of the resignation by the public employer. See Davis v. Marion County Eng'r, 60 Ohio St.3d 53, 573 N.E.2d 51, 53–54 (1991); State ex rel. Mullen v. Fayetteville-Perry Local Sch. Dist. Bd. of Educ., 53 Ohio App.3d 59, 557 N.E.2d 1235, 1237 (1988). In this case, the District accepted Rhoads's resignation at a special meeting on April 21, 1999, and notified her of this decision in writing within two days, making the resignation effective. Consequently, Rhoads could not later withdraw the resignation on April 27, 1999. See Davis, 573 N.E.2d at 54.

Rhoads also argues that the District's acceptance of her resignation is void because the District did not have the authority to accept her resignation at the April 21 special meeting. Specifically, she asserts that voting on her resignation violated § 100.7 of District policy, which provides that "[s]pecial meetings of the Board of Education may be called in accordance with law. No business shall be transacted at any special meeting that does not come within the purposes set forth in the call for meeting." According to Rhoads, the call for the special meeting included no reference to her resignation, rendering the District's acceptance of her resignation invalid. We need not consider this argument. Even if the District violated § 100.7 in accepting Rhoads's resignation, her claim that the decision is void is time-barred. Asserting that the board violated this provision is, in essence, asserting that it violated Ohio Rev.Code § 121.22(F), which requires every public body to provide public notice of "the time, place, and purpose of all special meetings." (emphasis added). While an action taken in violation of this provision is invalid, id. § 121.22(H), such an action must be challenged within two years from the date it was taken. Id. § 121.22(I)(1). Although Rhoads filed her complaint in this case within two years of April 21, 1999, the complaint does not assert a claim under § 121.22(I)(1). Rhoads first challenges the validity of the District's acceptance of her resignation in her motion for summary judgment, which was not filed until April 26, 2002—well beyond two years after the District accepted her resignation.

her attorney was present. But, after her claim was denied at Step III, the Union elected not to pursue Step IV arbitration on her behalf. Rhoads attempted to pursue arbitration on her own, but Morrison informed her that she was not allowed to do so under the terms of the CBA.

Rhoads's claim that she was deprived of procedural due process is twofold. She argues (1) that the final process she received—Step III—was procedurally inadequate because DiNino presided over the informal hearing even though he was not an impartial decisionmaker; and (2) that she was ultimately denied sufficient process because she was barred from pursuing her grievance at Step IV, the only procedure available to her for remedying the deficiencies of Step III.

This claim is unpersuasive. In fact, we need not consider whether DiNino was an impartial decisionmaker at Step III or whether Rhoads's due process rights were violated in a more general manner at that hearing. Even if the hearing was inherently biased against her, the availability of arbitration at Step IV provided Rhoads with an adequate procedural safeguard against such bias. *Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d Cir.1983); *see also Dykes*, 68 F.3d at 1571 (recognizing continued viability of *Jackson*); *Armstrong*, 964 F.2d at 951 (citing *Jackson* with approval). As the court explained in *Jackson*, "[t]he Union, as the sole and exclusive bargaining representative, had the ultimate power to make a fair and responsible determination as to whether it would invoke the arbitration provision available under the collective bargaining agreement. The right to proceed to arbitration provide[s] [an employee] with an adequate due process safeguard even if the hearing conducted by the [e]mployer earlier had been inherently biased."[5] 721 F.2d at 933. The fact that the Union elected not to pursue arbitration on Rhoads's behalf does not amount to a deprivation of her right to due process by DiNino.[6] *Dykes*, 68 F.3d at 1570–72; *White*, 1988 WL 116747, at *4 (holding that terminated public employee was afforded adequate post-deprivation due process where CBA provided for post-termination grievance-arbitration procedure and employee pursued procedure up until point at which union had discretion to pursue arbitration and the union decided not to do so); *see also Hennigh*, 155 F.3d at 1256 (finding no violation of due process by public employer where union declined to pursue his grievance at arbitration under a CBA); *Kuhlman v. Seattle Hous. Auth.*, Nos. 93–35714/35766, 1994 WL 463570, at *1 (9th Cir. Aug. 26, 1994) (holding that CBA with grievance-arbitration procedure provided employee sufficient post-discipline process and that union's refusal not to pursue grievances did not otherwise deprive employee of due process); *Farmer v. Merit Sys. Prot. Bd.*, No. 93–3533, 1994 WL 7103, at *3 (Fed.Cir. Jan.13, 1994) (stating that employee "cannot complain that his due process rights have been violated ... because his designated representative, the Union, voluntarily chose to terminate [employee's] grievance proceeding by withdrawing its request for arbitration"); *Armstrong*, 964 F.2d at 950–52 (holding that grievance-arbitration procedure in CBA provided a public employee with due

---

**5.** The availability of arbitration would not have been sufficient to protect Rhoads's right to due process if there was an indication that the arbitration would have been biased against her as well. *Jackson*, 721 F.2d at 931 n. 2. However, there is no evidence in the record to support such a conclusion.

**6.** A union's decision not to pursue arbitration on behalf of an employee may constitute state action where a public employer induces the union not to pursue arbitration. *See Jackson*, 721 F.2d at 931. There is no evidence that such was the case here.

process, even though CBA granted union the exclusive right to take grievance to arbitration and union refused to do so); *cf. Thomsen v. Romeis*, 198 F.3d 1022, 1029 (7th Cir.2000) (holding that employee who chose to have his union pursue his grievance against his employer—rather than to pursue it himself, as permitted under the CBA—could not argue that he was denied due process when union elected not to seek arbitration). At most, the Union's decision constituted a breach of the duty of fair representation owed by it to Rhoads. *See Herrera*, 1999 WL 815815, at *2; *Hennigh*, 155 F.3d at 1256 n. 2; *Armstrong*, 964 F.2d at 950. As such, her recourse for the Union's refusal to pursue arbitration of her grievance was against the Union, not against DiNino.

### III.

For the foregoing reasons, we affirm the district court's grant of summary judgment to defendants.