IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2021 Session

**KIMBERLY BLACK v. CITY OF CLARKSVILLE, TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2018-CV-820      Ross H. Hicks, Judge**

_____

**No. M2020-01580-COA-R3-CV**
_____

An employee sought a reasonable accommodation from her employer when she began experiencing increased difficulties with her debilitating rheumatoid arthritis. The employer was unable to provide a reasonable accommodation and, after concluding that the employee's disability rendered her physically unable to perform the essential functions of her job, the employer removed the employee from her position and placed her on paid sick leave. The employee then resigned and sued the employer for discriminatory discharge under the Tennessee Disability Act. The trial court granted summary judgment to the employer after determining that the employee was not qualified for the position and that the employee did not suffer an adverse employment action due to her voluntary resignation. Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and W. NEAL MCBRAYER, J., joined.

Benjamin K. Dean, Springfield, Tennessee, for the appellant, Kimberly Black.

Matthew C. Lonergan and John Patrick Rodgers, Nashville, Tennessee, for the appellee, City of Clarksville, Tennessee.

**OPINION**

FACTUAL AND PROCEDURAL BACKGROUND

In November 2011, the city of Clarksville, Tennessee ("the City") hired Kimberly Black on an at-will basis as a meter reader in the Water and Gas Department. The written job description for Ms. Black's position listed the following physical requirements: "reaching, standing, walking, fingering, grasping, feeling, talking, hearing, seeing, and

repetitive motions." Additionally, the job description provided that a meter reader's work required "exerting up to 50 pounds of force occasionally, and/or up to 10 pounds of force constantly to move objects" and that the work presented exposure "to electrical currents, extreme temperatures, inadequate lighting, work space restrictions, and travel."

Ms. Black was diagnosed with rheumatoid arthritis ("RA") in 2007, years before being employed as a meter reader, and the condition affected both her hands and feet. When she began working as meter reader in 2011, the City employed a total of eleven meter readers. By 2016, several meter readers had resigned and the City allowed two of those positions to remain vacant, causing an increase in the number of meters Ms. Black was expected to read. The increased workload made it harder for Ms. Black to do her job because it made her RA worse. Ms. Black approached her supervisors about seeking other jobs within the Gas and Water Department and was informed that she needed to receive additional education and training. Her supervisors further informed her that the Gas and Water Department offered training classes she could attend to increase her qualifications for future positions that may become available. Ms. Black did not attend any of the training classes, nor did she receive any additional educational or vocational training.

In December 2016, Ms. Black sent an email to Denise Johnson, who worked in the City's human resources office, seeking assistance due to the increased difficulties she was experiencing with her RA. Ms. Johnson met with Ms. Black to discuss possible assistance and gave her an accommodation request form to complete which Ms. Black completed and returned on February 13, 2017.

The accommodation request form included a question asking what specific accommodation was being sought. Ms. Black answered, "Something that will prevent me from being outside all day and not lifting something with my hands constantly, all day or having a tight grip in both hands." She then stated that the City could explore the following accommodation: "Maybe some type of office work, or anything else to keep me from doing the above constantly all day without a rest, and to keep me out of the weather all day, esp[ecially] the cold weather." In response to a question asking what, if any, job function she was having difficulty performing, Ms. Black wrote, "Being fast enough for their liking, the more meters I read the worse my pain is. Two positions weren't filled, and those routes were split with the rest of us, so that's even more to read." She also wrote on the form that "[r]ight now it hurts to work because I hurt so bad" and "I hurt all the time, too tired to take care of things." Finally, Ms. Black identified the following as a limitation that was interfering with her ability to perform her job or access an employment benefit: "My RA, the weather, they want us to read more and be as fast as can be and keep that pace up day after day. I'm having trouble doing that, esp[ecially] in bad weather. I don't know of any employment benefit. I never take a lunch."

After receiving Ms. Black's accommodation request form, Ms. Johnson sent Ms. Black a copy of the job description for the meter reader position and a medical inquiry

form for Ms. Black's doctor to complete. Dr. Kishorkumar A. Desai, Ms. Black's RA doctor, completed the medical inquiry form on March 15, 2017. He indicated that Ms. Black had a physical impairment, stating that she has RA and deformities in her hand and foot joints which prevented her from being able to lift, walk, and use her hands repetitively. Dr. Desai requested that the City help her find a job that did not require repeated hand usage.

Ms. Black submitted the completed medical inquiry form to Ms. Johnson on March 24, 2017. Ms. Johnson then sent a memorandum to Pat Hickey, the general manager of the Gas and Water Department, Will Wyatt, the human resources director, and John Eskew, the risk manager, on March 27, 2017, stating, in relevant part:

> Kimberly met with me on Friday, March 24, 2017 to return the physicians form (copy attached) and discussed her chronic medical condition. Kimberly submitted a letter from her physician requesting Kimberly be alleviated of her job duties of excessive walking and repetitive hand use due to rheumatoid arthritis. Kimberly and her physician are requesting a transfer to a position that is primarily indoor work, with no excessive walking or hand use.
> Please respond, at your earliest convenience, your opinion, suggestion and/or decision on this request for reasonable accommodation.

After receiving the March 27, 2017 memorandum, Mr. Hickey looked to see if there were any open positions in the Gas and Water Department that Ms. Black was qualified for and physically capable of doing based on her limitations as detailed by Dr. Desai in the medical inquiry form. Mr. Hickey ultimately concluded that there were not any.

While waiting for a decision about her accommodation request, Ms. Black's difficulties continued. She sent an email to Ms. Johnson on April 2, 2017, stating, "To be honest with you Denise, I dont [sic] know how well I can preform [sic] another type job. I can try if that's what will happen to me. . . . I'm trying to do my best with my job right now. I'm hurting and it's getting more difficult each day." Ms. Black sent another email to Ms. Johnson several days later informing Ms. Johnson that what "it will come down to, [is] I can't take it anymore and go out on my own because it's taking a while to hear anything" about the accommodation request.

On April 10, 2017, Mr. Hickey discussed with Ms. Johnson the medical inquiry form completed by Dr. Desai, and the decision was made to stop Ms. Black from reading meters based on what Dr. Desai wrote on the form.[1] Mr. Hickey and Ms. Black's manager,

---

[1] In her appellate brief, Ms. Black points out that there is some conflicting testimony regarding whether Mr. Hickey or Ms. Johnson made the decision to pull Ms. Black from her meter reader job duties. This conflicting testimony does not create a genuine issue of material fact, however, because there is no dispute that the City did, in fact, remove Ms. Black from her meter reader job duties on April 11, 2017. Whether Mr. Hickey or Ms. Johnson was the City employee who made the decision is immaterial.

Krystal Richardson, met with Ms. Black on April 11, 2017, to inform her that they were pulling her from reading meters and that she needed to meet with Ms. Johnson to see what options were available to her. Following the meeting, Mr. Hickey sent Ms. Black an email summarizing what had been discussed during the meeting and informing her that, in the interim, she would be using her paid sick leave.

Ms. Black met with Ms. Johnson on April 13, 2017, to review other job openings with the City that might be available. That afternoon, Ms. Johnson sent an email to Mr. Hickey stating that she and Ms. Black agreed that, based on Ms. Black's qualifications and medical restrictions, Ms. Black was not qualified for any of the City's open positions. Also that same afternoon, Ms. Johnson received an email from Ms. Black asking whether she should resign rather than being terminated and whether she should "give a letter to Bob [Frazier, Ms. Black's supervisor] saying when my last day will be?" Ms. Black then stated in this email that her sick leave would end on April 28, 2017, and asked if the City would extend her last day of employment to May 1, 2017, so her health insurance would remain in effect through the end of May, to cover medical expenses associated with a surgery she had scheduled for May 1, 2017. The City agreed to the extension.

The following day, on April 14, 2017, Mr. Frazier went to Ms. Black's home and presented her with a resignation letter with that day's date on it. The letter provided that Ms. Black's last day of employment would be May 2, 2017. Mr. Frazier told Ms. Black that it was better to resign than to be terminated and asked her to sign the letter because he needed to post her meter reader position. Ms. Black signed the resignation letter and remained on paid sick leave from April 11, 2017 through May 2, 2017, at which point, her employment ceased.

On April 28, 2017, Ms. Black applied for long-term disability benefits. The long-term disability claim form included a question asking Ms. Black to provide the date she was first unable to work due to her medical condition; Ms. Black wrote, "4-12-17." In response to the question "What specific duties of your occupation are you unable to perform due to your medical condition," Ms. Black wrote, "Steady Repetive [sic] Work, being with outside elements all day." Dr. Desai also completed part of the form and, in response to the question "If your patient has CURRENT PHYSICAL RESTRICTION (activities patient should not do) and/or PHYSICAL LIMITATIONS (activities patient cannot do), list below," he wrote, "No repeated hand use like reading meter, car wash, etc. No walking due to feet pain. Can not do any work like repeated hand use like reading meter." He then wrote that the duration of these restrictions and limitations would be "indefinite."

After Ms. Black's employment with the City ended on May 2, 2017, she filed a complaint against the City asserting a claim for discriminatory discharge under the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103 to -104. Following discovery, the City filed a motion for summary judgment, arguing that Ms. Black's TDA

claim failed as a matter of law because she was not qualified for the meter reader position due to her RA and because she did not suffer an adverse employment action due to her resigning rather than being terminated. The trial court granted the City's motion and dismissed the case with prejudice. Ms. Black filed a timely appeal and presents only one issue for our review: whether the trial court erred in granting summary judgment to the City.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other discovery that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008) (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

ANALYSIS

Ms. Black asserted her discriminatory discharge claim under the TDA, which prohibits

discrimination in the hiring, firing, and other terms and conditions of employment of the state of Tennessee or any department, agency, institution or political subdivision of the state, or of any private employer, against any applicant for employment based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved.

Tenn. Code Ann. § 8-50-103(b). To succeed under the TDA, an individual alleging discrimination must demonstrate "'(1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability.'" *Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841 (Tenn. Ct. App. 2009) (quoting *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000)); *see also Hilliard v. Dolgencorp, LLC*, No. E2018-00312-COA-R3-CV, 2019 WL 1377263, at *9 (Tenn. Ct. App. Mar. 26, 2019).

"When interpreting Tennessee's anti-discrimination laws, such as the TDA and the [Tennessee Human Rights Act]," a court is "'neither bound by nor restricted by the federal law.'" *Bennett*, 315 S.W.3d at 841 (quoting *Barnes*, 48 S.W.3d at 705). Nevertheless, our Supreme Court has noted that a court "'may look to federal law for guidance in enforcing our own anti-discrimination laws.'" *Id.* (quoting *Barnes*, 48 S.W.3d at 705).

The threshold issue in these cases is whether the claimant, in fact, had a disability. *Id.* at 842 (citing *Barnes*, 48 S.W.3d at 705). In the present case, it is not disputed that Ms. Black had a TDA-covered disability.[2] We, therefore, will focus our analysis on the other two elements—whether Ms. Black was qualified for the position and whether she suffered an adverse employment action due to her disability.

A. Whether Ms. Black was "qualified."

"Under the TDA, an employer will not be considered to have unlawfully discriminated against an individual with a disability if the individual's disability 'to some degree prevents the applicant from performing the duties required by the employment

---

[2] "[T]he TDA does not define the term 'disabled,' [but] the definition contained in the Tennessee Human Rights Act ("THRA") is applicable to TDA claims." *Jones v. Sharp Elecs. Corp.*, No. W2013-01817-COA-R3-CV, 2014 WL 806131, at *3 (Tenn. Ct. App. Feb. 28, 2014). The THRA provides the following definition of disability as it relates to a person:

    (i) A physical or mental impairment that substantially limits one (1) or more of such person's major life activities;
    (ii) A record of having such an impairment; or
    (iii) Being regarded as having such an impairment[.]

Tenn. Code Ann. § 4-21-102(3)(A)

sought or impairs the performance of the work involved.'" *Id.* at 852 (quoting Tenn. Code Ann. § 8-50-103(b)). Courts have interpreted the "to some degree" language in the TDA as requiring "a claimant under the TDA to show that he or she 'was qualified for the position' in addition to the other two elements . . . ." *Id.* at 852-53 (quoting *Barnes*, 48 S.W.3d at 705).

What is required for a claimant to be considered "qualified" for a position? Under the federal Americans with Disabilities Act, "this inquiry has two prongs: the individual must (1) possess the requisite skill, education, experience, and training for the position; and (2) be able to perform the essential job functions, with or without reasonable accommodation." *Id.* at 853 (citing 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m)). The TDA, unlike the ADA, contains no reasonable accommodation requirement. *Hilliard*, 2019 WL 1377263, at *11 (citing *Jones*, 2014 WL 806131, at *3); *see also Bennett*, 315 S.W.3d at 841-42. As a result, an employer does not violate the TDA by failing to provide a reasonable accommodation to assist an employee in performing the duties of his or her job. *Id.* If a claimant needs an accommodation to be capable of performing the essential functions of the position, the claimant is not considered to be qualified for the job and may not look to the TDA for protection. *See Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 468 n.9 (6th Cir. 1999) ("A determination that an accommodation is required for the employee to perform the functions of the job ends the inquiry under Tennessee law . . . ."). Therefore, if a claimant filing under the TDA has a disability that renders him or her physically incapable of performing the essential functions of the position "to some degree," his or her claim fails as a matter of law.[3]

Here, there is no dispute that Ms. Black "possess[ed] the requisite skill, education, experience, and training" for the meter reader position. *Bennett*, 315 S.W.3d at 853. The parties' disagreement concerns whether she was capable of performing the essential functions of the position. "Essential functions generally are those that the employer's

---

[3] Because Ms. Black also asserted various claims under the ADA, the case was temporarily removed to a federal circuit court. After clarifying that the only claim she intended to assert was one of discriminatory discharge under the TDA, the federal court entered an agreed order dismissing all of Ms. Black's claims or potential claims with prejudice except her claim for discriminatory discharge under the TDA. Thus, the case before the trial court was limited to one claim: her discriminatory discharge claim under the TDA. Despite them being dismissed with prejudice, Ms. Black attempts to revive her ADA claims like the miraculous raising of Lazarus at Bethany by incorporating them into her TDA claim arguments. Specifically, her appellate brief is replete with arguments regarding the City's failure to comply with the TDA because it failed to follow the ADA's reasonable accommodation obligation and interactive process requirement. Claims for reasonable accommodations and an interactive process are not supported under the TDA. *See Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841-42 (Tenn. Ct. App. 2009) (citing *Roberson v. Cendant Travel Servs., Inc.*, 252 F. Supp. 2d 573, 583 (M.D. Tenn. 2002)); *see also Hilliard*, 2019 WL 1377263, at *11 (providing that the ADA's interactive process requirement is not activated until the employee requests a reasonable accommodation). We, therefore, decline to consider these arguments in the analysis section of this opinion.

'judgment' and 'written [job] description' prior to litigation deem essential." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761-62 (6th Cir. 2015) (quoting 42 U.S.C. § 12111(8)). Prior to litigation, the written job description[4] for the meter reader position identified several physical requirements of the position, including "walking," "fingering," "grasping," and "repetitive motions." The written job description also provided that a meter reader would be required to "exert[] up to 50 pounds of force occasionally, and/or up to 10 pounds of force constantly to move objects" and presented exposure to extreme temperatures.

Ms. Black's doctor unequivocally stated several times that she could not perform these essential functions. First, on the medical inquiry form, Dr. Desai responded to a question asking whether Ms. Black's impairment substantially limited a major life activity by circling "Yes" and writing that she "[c]an not do repeated activity like vacuum using hands [sic] joints in cold weather like reading meters etc." Second, in response to the question "What limitation(s) is interfering with job performance or accessing a benefit of employment," Dr. Desai wrote, "Repeated hands [sic] joints use at work mainly reading meters & lifting lids. Excessive walking due to feet deformity." He provided the same answer to a question asking what job functions Ms. Black was having difficulty performing. Dr. Desai then recommended that the City assist Ms. Black in finding a "job that has less repeated hands use." Finally, on Ms. Black's long-term disability claim form,[5]

---

[4] Ms. Black argues that the written job description should not be considered because it is unauthenticated and constitutes hearsay. Contrary to her assertion, however, an examination of the record shows that Ms. Black authenticated the written job description when a copy of it was presented to her during her deposition. Furthermore, during her deposition, she confirmed that the written job description was "what I did" and that the physical requirements listed were accurate. The record also shows that the City attached to its motion for summary judgment the declaration of Will Wyatt, the director of the City's human resources department. In the declaration, Mr. Wyatt stated that he was responsible for the "care, custody, and control" of documents relating to job descriptions and that it was a regularly conducted business activity to keep such records and to rely on them for "taking actions relating to employees." He then confirmed that the written job description attached as Exhibit 6 to Ms. Black's deposition was the job description in effect for a meter reader while Ms. Black still worked for the City in 2017. In light of these facts, it was appropriate for the trial court to consider the written job description.

[5] In her appellate brief, Ms. Black makes several arguments relating to the long-term disability claim form. First, she argues that the trial court should not have considered her statements on the form because they came after, rather than at the time, she was removed from the meter reader position. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) (stating that, to recover under the ADA, plaintiff must "establish as part of her prima facie case that she was a 'qualified individual with a disability' *at the time of the discriminatory act*"). Although Ms. Black made the statements after she was removed from the position, they are still relevant because they assist in determining whether she was able to perform the essential functions of the position at the time the City relieved her of her job duties. *See Stallings v. Detroit Pub. Sch.*, 658 F. App'x 221, 225 (6th Cir. 2016) (stating that it was "incongruous" for the plaintiff to claim she was capable of performing the essential functions of her job with an accommodation, but was unable to perform them at all eight days later when she completed her social security disability benefits application).

in response to the question "If your patient has CURRENT PHYSICAL RESTRICTIONS (activities patient should not do) and/or PHYSICAL LIMITATIONS (activities patient cannot do), list below," Dr. Desai wrote, "No repeated hand use like reading meter, car wash etc. No walking due to feet pain. *Can not do any work like repeated hand use like reading meter*." (Emphasis added).

In making its decision to pull Ms. Black from her meter reading duties because she could no longer perform the essential functions of the job, the City relied heavily upon Dr. Desai's statements on the medical inquiry form regarding Ms. Black's physical limitations.[6] Ms. Black contends that the City should not have relied upon Dr. Desai's

---

Second, Ms. Black contends that the trial court should not have considered Dr. Desai's statements on the long-term disability claim form because they were made after she was removed from the meter reader position and, therefore, are irrelevant for establishing whether she was qualified at the time of the removal. We disagree. Dr. Desai's statements in the long-term disability claim form did not constitute a new diagnosis. Indeed, they merely confirmed the diagnosis he made on the medical inquiry form prior to Ms. Black's removal. Thus, they were relevant to determining whether she was qualified for the position at the time the City removed her from it.

Ms. Black next contends that Dr. Desai's statements on the long-term disability claim form should be excluded because they constitute inadmissible hearsay. This argument is completely without merit. Dr. Desai completed an affidavit stating he was the custodian of the record and that it was made in the course of "regularly conducted activity," which is an exception to the hearsay rule. *See* TENN. RS. EVID. 803(6), 902(11).

Ms. Black asserts another slightly related argument. She argues that a genuine issue of material fact exists because, when determining whether she remained qualified for the meter reader position, the City solely relied on what Dr. Desai wrote rather than on how the disability affected her job performance. A thorough examination of Ms. Johnson's testimony shows that was not the case, however. Specifically, Ms. Johnson testified that the City's decision was "[b]ased on Ms. Black saying I can no longer do my job and I need accommodation." It is undisputed that Ms. Black wrote on the accommodation request form that her RA was a limitation interfering with her ability to perform her job. Based on the foregoing, we conclude that the trial court did not err in considering the statements on the long-term disability claim form.

[6] The record shows that it is the City's standard practice to follow a doctor's restrictions when determining whether an employee can perform the essential functions of his or her job. Ms. Black acknowledges this in her appellate brief:

> The City of Clarksville has a practice and history that if an employee has what the City claims to be 'medical restrictions' and the City cannot accommodate the "restrictions," and the employee puts in for ADA accommodation and the employee is told no, the City is not going to accommodate or the City cannot accommodate, then in each of those instances the City of Clarksville has brought the employee in and their relationship with the City ceased to exist.

She asserts that such a practice creates a genuine issue of material fact regarding the City's discrimination against employees with disabilities. We disagree. Under the TDA, an employer may remove an employee from his or her job if the employee is no longer qualified for the position due to the disability. *See Bennett*, 315 S.W.3d at 852. Moreover, the TDA contains no reasonable accommodation requirement, so an employer is not required to provide a reasonable accommodation to assist a disabled employee in performing his or her job duties. *Bennett*, 315 S.W.3d at 841-42 (Tenn. Ct. App. 2009) (citing *Roberson*, 252 F. Supp. 2d at 583; *see also Hilliard*, 2019 WL 1377263, at *11. This argument is without merit.

statements. Essentially, Ms. Black's argument is that she desired to continue working for the City and, when no accommodation was available for her, the City should have returned her to her meter reader position because she had been able to perform her job duties in the past despite the pain caused by her RA. Contrary to Ms. Black's contention, however, "where a plaintiff's 'own doctor,' not the defendant, 'has concluded she could not perform her job . . . [that plaintiff] cannot establish that she is a "qualified individual with a disability" under the ADA.'" *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (quoting *Weigel v. Target Stores*, 122 F.3d 461, 467 (7th Cir. 1997)). An employer is "'entitled to take'" an employee's physician at his or her word and "'may rely'" upon the physician's words to determine that the employee cannot perform the essential functions of the employee's job. *Griffith v. Wal-Mart Stores, Inc.*, 135 F.3d 376, 383 (6th Cir. 1998) (quoting *Weigel*, 122 F.3d at 467-68). In fact, a "doctor's restrictions must be taken at face value," and an employer is "reasonable . . . to assume that [an employee] could not perform a task that her doctors indicated she was incapable of safely performing." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 986 (6th Cir. 2011); *see also Mathis v. City of Red Bank*, 657 F. App'x 557, 562 (6th Cir. 2016) ("The City rightly assumed that the parameters established in [the doctor's] 2013 letter were accurate, and on that basis it properly understood its choice: give [plaintiff] a job with exclusively indoor work or lay him off."). Thus, the City acted reasonably in relying on Dr. Desai's statements on the medical inquiry form to determine that Ms. Black was no longer able to perform the essential functions of her job.

Nonetheless, Ms. Black contends that a genuine issue of material fact exists regarding whether she was qualified for the meter reader position because she had worked through the pain in the past and could continue to do so. We respectfully disagree. "'[A] plaintiff's uncorroborated belief in his physical prowess is not enough to counter affirmative evidence to the contrary.'" *Johnson*, 443 F. App'x at 986 (quoting *Boback v. Gen. Motors Corp.*, 107 F.3d 870, No. 95-3836, 1997 WL 3613, at *3 (6th Cir. 1997)). Ms. Black attempts to corroborate her belief that she can continue to do the job by relying on the testimony of two other City employees who stated that, in the past, she had performed the essential functions of the meter reader position. As the City points out, however, this evidence establishes that Ms. Black previously was qualified for the position.

___

Ms. Black also argues that the City mistakenly considered Dr. Desai's statements as "restrictions." She points out that the pertinent questions answered by Dr. Desai expressly used the term "limitations" rather than the term "restrictions." Then, relying on definitions found in Exhibit 26 to her deposition (the long-term disability claim form), Ms. Black asserts that a "restriction" is "something someone cannot do" while a limitation is "something someone should not do." Ms. Black has confused the two definitions. An examination of Exhibit 26 shows that, in fact, a "restriction" is defined as "something someone should not do," and a "limitation" is defined as "something someone cannot do." In other words, "limitations" are stricter than restrictions. Thus, although Dr. Desai's statements constitute "limitations" rather than "restrictions," this does not create a genuine issue of material fact because they are still activities that Ms. Black can no longer perform. As such, they provided a basis upon which the City could conclude that she was no longer able to perform the essential functions of the position.

- 10 -

It does not indicate that she remained qualified for the position in light of the limitations Dr. Desai placed on her. Therefore, Ms. Black's belief that she could still do the job remains uncorroborated and "is simply irrelevant" as to whether she was qualified for the job. *Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003); *see also Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 603 (7th Cir. 1999) ("Koshinski may have shown that he wanted to return to work despite the risk of pain and harm, but that is not the test. He had to show that he was qualified to do the job. And neither he nor his doctors thought he was."); *Taylor v. AutoAlliance Intern. Inc.*, No. 08-cv-11318, 2009 WL 2591533, at *7 (E.D. Mich. Aug. 24, 2009) ("Plaintiff's personal belief is insufficient to create a question of material fact when severely undermined by her own previous statements, medical documentation, and workplace restrictions.").

In addition to being irrelevant, Ms. Black's after-the-fact belief that she could still do the job is entirely discredited by her own prior statements because she admitted several times that her RA, to some degree, prevented or impaired her performance of the essential functions of the meter reader position. For instance, in an email sent to Ms. Johnson in December 2016, Ms. Black asked for assistance in finding another job because she was experiencing increased difficulty performing her meter reader duties due to her RA. In that same email, Ms. Black stated that "all I do is hurt and sleep, no wonder why I'm starting to complain, I need relief BAD" and that she could "do another job, just not in this very cold weather anymore constantly lifting and holding that hook in my hand."

On the accommodation request form, Ms. Black stated that she could no longer use her hands repetitively, grasp, lift, or be exposed to extreme temperatures. When completing the accommodation request form, Ms. Black provided the following response to the question "What limitation is interfering with your ability to perform your job or access an employment benefit?":

> My RA, the weather, they want us to read more and be as fast as can be and keep that pace up day after day, *I'm having trouble doing that, esp. in bad weather.* I don't know of any employment benefit. I never take a lunch.

(Emphasis added). She then wrote that she wanted anything that would prevent her "from being outside all day . . . lifting something with [her] hands constantly . . . without a rest, and to keep [her] out of the weather all day, esp. the cold weather."

On the long-term disability claim form, Ms. Black admitted that she was unable to perform her job due to her RA. Specifically, on the long-term disability claim form, she wrote, "Steady Repetive (sic) Work, being with outside elements all day" in response to the question "What specific duties of your occupation are you unable to perform due to your medical condition?" She also responded to the question "Date you were first unable to work due to this medical condition" by writing "4-12-17." All of these statements by

Ms. Black constitute express admissions that her disability "to some degree" prevented or impaired her ability to perform the duties of the meter reader position.

Based on both Ms. Black's statements and those of Dr. Desai, we conclude that the trial court did not err in determining that Ms. Black was no longer qualified under the TDA to continue working as a meter reader.

B. Whether Ms. Black suffered an adverse employment action.

Ms. Black next asserts that the trial court erred in concluding that the City was entitled to summary judgment even if she had been qualified under the TDA because she did not suffer an adverse employment action due to her voluntary resignation from her position. According to Ms. Black, she signed the resignation letter involuntarily. "A public employee with a property interest in continued employment is deprived of that interest by her employer if the employer constructively discharges her by forcing her to resign involuntarily." *Rhoads v. Bd. of Educ. of Mad River Local Sch. Dist.*, 103 F. App'x 888, 894 (6th Cir. 2004) (citing *Parker v. Bd. of Regents*, 981 F.2d 1159, 1162 (10th Cir. 1992)). In the event that an employee resigns of his or her own volition, however, "even as a result of the [employer's] actions, then [he or] she voluntarily relinquishes [his] or her property interest in continued employment, and the [employer] cannot be found to have deprived [him or] her of that interest without due process of law." *Id.* (citing *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997)). Thus, a voluntary resignation does not constitute an adverse employment action. *See Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 447 (6th Cir. 1999) (citing *Keever v. City of Middletown*, 145 F.3d 809, 813 (6th Cir. 1998)).

"In general, employee resignations are presumed to be voluntary," but "[a]n employee may rebut this presumption by producing evidence indicating that the resignation was involuntarily procured." *Rhoads*, 103 F. App'x at 895 (citing *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999)). When considering whether an employee's resignation was involuntary, courts consider "whether an objectively reasonable person would, under the totality of the circumstances, feel compelled to resign if he [or she] were in the employee's position." *Id.* (citing *Yearous* 128 F.3d at 1356). This inquiry includes the following factors: "'(1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice [she] was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation.'" *Id.* (quoting *Lenz v. Dewey*, 64 F.3d 547, 552 (10th Cir. 1995)).

Focusing on the first factor, Ms. Black asserts that her resignation was not voluntary because she was not given an alternative to resignation. She supports this argument by relying on the testimony of Mr. Frazier, Mr. Wyatt, and Ms. Richardson that she would have been terminated had she not resigned. The Court of Appeals for the Sixth Circuit has

- 12 -

held that "[t]he mere fact that an employee is forced to choose between resignation and termination does not alone establish that a subsequent choice to resign is involuntary, provided that the employer had good cause to believe there were grounds for termination." *Rhoads*, 103 F. App'x at 895 (citing *Parker*, 981 F.2d at 1162). The City had good cause to terminate Ms. Black—she could not perform the essential functions of the meter reader position. Therefore, the fact that Ms. Black had to choose between two unfavorable options does not mean she made her choice to resign involuntarily. *See Graehling v. Village of Lombard, Ill.*, 58 F.3d 295, 298 (7th Cir. 1995) (stating that "one who elects between lawful alternatives cannot later cry 'coercion'").

Ms. Black next asserts that she neither understood the choice she was given (factor 2) nor had a reasonable time in which to make her choice (factor 3) because she was not able to consult with an attorney prior to signing the resignation letter. This argument would have been more persuasive had the City not allowed Ms. Black time to consult with an attorney or if Ms. Black had actually requested that she be able to consult with an attorney prior to signing the resignation letter; neither of those happened. Furthermore, evidence in the record shows that Ms. Black knew exactly what she was doing in resigning from her position. In an email sent to Ms. Johnson the day before signing the resignation letter, Ms. Black requested that May 1, 2017 be the effective date of her resignation so she would be covered by the City's health insurance plan when she had surgery that month.

The following day, Mr. Frazier, unaware of Ms. Black's email to Ms. Johnson, called Ms. Black and asked her if she would sign a resignation letter stating that her resignation would be effective April 28, 2017. Mr. Frazier testified that Ms. Black asked him if the City "would extend it to the 2nd of May so she could be covered on her insurance." When the City agreed to the extension, Mr. Frazier presented Ms. Black with a copy of the letter that stated the effective date of her resignation would be May 2, 2017, and Ms. Black signed it. Pertinent to the fourth factor, the email to Ms. Johnson and Mr. Frazier's testimony show that Ms. Black selected the effective date of her resignation prior to signing the resignation letter. Based on the foregoing, we conclude that the trial court did not err in concluding that Ms. Black's resignation was voluntary.

Finally, recognizing how damning the resignation letter is to her case, Ms. Black makes a last-ditch effort to circumvent it by arguing that the City actually terminated her when it stopped her from reading meters on April 11, 2017. She further argues that her subsequent resignation letter "does not obviate, unwind or cure the prior adverse employment action undertaken at the April 11, 2017 meeting." We disagree. "Termination of employment" means "[t]he complete severance of an employer-employee relationship." BLACK'S LAW DICTIONARY (11th ed. 2019). The employment relationship between Ms. Black and the City was not completely severed when Ms. Black was pulled from reading meters on April 11, 2017. Indeed, the relationship continued until May 2, 2017, because Ms. Black remained on the City's payroll receiving paid sick leave.

In light of the foregoing, we conclude that the trial court did not err in granting summary judgment to the City.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Kimberly Black, for which execution may issue if necessary.


_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE